UNITED STATES of America, Appellee,

v.

Ferlin K. DORIAN, Appellant.

No. 85–5435.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1986.

Decided Oct. 27, 1986.

Rehearing Denied Dec. 2, 1986.

Joseph E. Ellingson, Winner, S.D., for appellant.

Mikal Hanson, Asst. U.S. Atty., Pierre, S.D., for appellee.

Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Ferlin Dorian appeals from a jury verdict finding him guilty of assault with intent to commit rape. The victim was Dorian's five-year-old daughter, Roxanne. For reversal, Dorian argues (1) that the district court [1] erred in admitting the hearsay testimony of Roxanne's foster mother regarding statements Roxanne made about the sexual abuse; and (2) that admission of the hearsay statements violated his sixth amendment right of confrontation. For the reasons discussed below, we affirm.

## I. BACKGROUND.

In June of 1985, Ferlin Dorian was living in Rosebud, South Dakota, on the Rosebud Indian Reservation with his wife, Norma, and their three children: Roxanne (age 5), Ferlin, Jr. (age 4), and Buck (age 2). On the night of June 14, after they had been drinking for several hours, Ferlin and Norma began to quarrel. According to Norma, Ferlin eventually told her to get out of the house and leave Roxanne there.[2] Norma left, taking Roxanne with her, and sought refuge at a friend's house. The friend later testified that Norma arrived drunk and crying, and said that Ferlin was going to get her and that he was trying to rape her daughter. Apparently frightened that Ferlin would follow them, Norma soon left the friend's house and walked with Roxanne to the Rosebud Police Department.

The police officer who met with Norma at the police station that night observed that she was very frightened and agitated, and that she appeared to be intoxicated. He testified that Norma grabbed him and said, "He is after us, he is after us." When he took Norma and Roxanne into a secure area of the police station, Norma calmed down somewhat, and said, "Ferlin is trying to get my daughter. We can't stay at home." The police officer tried without success to locate a relative with whom Norma and Roxanne could stay, and then contacted Penny Virchow, the on-call child protection worker for the State Department of Social Services, to make arrangements for Roxanne. Norma agreed to stay in protective custody at the police station for the night.

Penny Virchow took custody of Roxanne, and, at approximately 2:00 a.m. on June 15,

---

1. The Honorable Donald J. Porter, United States District Judge for the District of South Dakota.

2. The Dorians' sons were staying at their grandmother's house at the time.

placed her in emergency foster care at the home of Roger and Monica Whiting. Ms. Virchow testified that Roxanne was extremely upset and frightened at the time. When the social worker returned to the Whiting's home later that morning to reassure Roxanne that her mother was all right and to try to find out what had happened to frighten the child, Roxanne was still frightened and spoke very little, communicating mostly by nodding her head.

According to Roxanne's foster mother, Monica Whiting, Roxanne continued to act frightened for several days, and after a chance encounter with her parents at a local drive-in, refused to go outside to play. When Monica asked why, Roxanne explained that she was afraid that her parents might have followed them to the Whitings' home. Monica also testified that Roxanne was initially very fearful of men, and that she was especially intimidated by a male guest in their home who was drinking beer.

On June 17, 1985, Monica took Roxanne for a routine physical exam at the Mission Medical Clinic. Monica testified that the examination proceeded without incident until the physician's assistant reached for a speculum to do a vaginal exam. At that point, Roxanne, who had been lying down, sat bolt upright, put her hands between her legs, and looked terrified.

In an effort to find out what was behind Roxanne's abnormal behavior and to determine whether the Department of Social Services needed to file a petition for a minor in need of care, Penny Virchow, Priscilla Hornby (the Supervisor of Child Protection Services in Mission), and Monica Whiting conducted several interviews with Roxanne. The first interview took place between Roxanne and Penny Virchow on June 17, 1985, in a bedroom of the Whiting's home. Anatomically correct dolls were used to facilitate the interview, because Roxanne was still uncommunicative. Ms. Virchow asked Roxanne if her mother touched her anywhere on her body to hurt or scare her, and Roxanne nodded no. When asked the same question about her father, Roxanne nodded yes. Ms. Virchow then repeated the question as she pointed to various parts of the girl doll's body. Roxanne gave negative responses except when Ms. Virchow pointed to the doll's chest. She then indicated that she felt scared when her father touched her there, and that although she was fully clothed when he did so, her father was not wearing a shirt.

The second interview took place on June 19, 1985, in the Whiting's living room. In addition to Roxanne and Penny Virchow, Monica Whiting and Priscilla Hornby were present. Anatomical dolls were again used, and this time, Ms. Virchow pointed with the hand of the male doll to parts of the girl doll's body, and asked Roxanne if it scared her when her father touched her there. Again, Roxanne responded that she felt scared when her father touched her on the chest. She became very uneasy and uncommunicative during the course of the interview, and indicated that she wanted Penny Virchow to leave. Thereafter, Monica Whiting and Priscilla Hornby continued the interview, and at some point, asked Roxanne if her father ever put anything between her legs. Roxanne shook her head no.

That day, Roxanne was taken to see a physician for a complete physical examination. The examination revealed that the entrance to Roxanne's vagina was red and inflamed, and that there was a tear in her hymenal ring. Because the edges of the tear were healed, the physician estimated that the injury had occurred at least five or six days prior to the examination, although it could have happened years earlier. The physician testified that she could not state with any degree of medical certainty what had caused the inflammation or the tear in the hymen, but her impression was suspected sexual abuse.

Priscilla Hornby and Monica Whiting interviewed Roxanne again on June 24, 1985. On this occasion, the anatomical dolls were not used. Because Roxanne found it easier to communicate with only Monica present, the two of them went into the Whiting's

kitchen to talk, while Ms. Hornby waited in the living room. Roxanne told Monica about a time when her father carried her from the kitchen of the Dorian home into the bedroom, where he took off his pants and undershorts. Roxanne said her mother then came into the room and told her father to get out, and he left. Monica and Roxanne went back into the living room and related the incident to Ms. Hornby. Later, Ms. Hornby asked Roxanne again if her father had ever put anything between her legs, and this time Roxanne responded that he had put his finger there.

The final interview took place on July 10, 1985, with Roxanne, Monica, and Priscilla Hornby present. The interview began in the Whiting's living room, but when Roxanne was reluctant to talk in front of Ms. Hornby, she and Monica went into the kitchen. Monica testified that Roxanne then told her about a time when she was sleeping in a bed, and her father came in and woke her up. Roxanne said that her father was standing at the foot of the bed with his trousers and undershorts off, and that she was scared and ran into the kitchen. She said her father followed her into the kitchen and picked her up under the arms. According to Monica, Roxanne covered her face with her hands at this point, and was very reluctant to continue her story. Monica then suggested that Roxanne use the anatomical dolls to show what happened next.

Monica and Roxanne returned to the living room and, using the dolls Roxanne had previously designated as the "Roxanne doll" and the "daddy doll," recreated for Ms. Hornby what Roxanne had already told Monica. Roxanne said she was wearing a red dress that day, so they put a red dress on the Roxanne doll, and put the doll in a box that was supposed to be a bed. At Roxanne's direction, the pants and underwear were removed from the daddy doll, and it was placed at the foot of the "bed." When Roxanne agreed that they had everything right, they showed the daddy doll waking the Roxanne doll, and showed the Roxanne doll running into the kitchen. They then showed the daddy doll picking up the Roxanne doll under the arms. At this point, Roxanne again became reluctant to continue in front of Ms. Hornby, so she and Monica took the dolls into the kitchen.

Monica testified that Roxanne then showed the Roxanne doll hitting the daddy doll on the chest. According to Monica, Roxanne became very frightened when she showed this, as though she thought she had done something very bad. However, when Monica reassured her that hitting her father was okay, Roxanne relaxed and continued her story. She then showed the daddy doll hitting the Roxanne doll in the stomach, and the Roxanne doll falling to the floor. Roxanne then had the daddy doll pick up the Roxanne doll, carry her back into the bedroom, and lay her on the bed. She showed the daddy doll pulling the Roxanne doll's dress up to her shoulders, and taking the panties off the Roxanne doll. Roxanne had the daddy doll kneel on the bed next to the Roxanne doll, and then moved the daddy doll between the Roxanne doll's legs. Monica testified that when she asked what happened next, Roxanne said, "He put his boy thing in the hole between my legs." Roxanne then showed the daddy doll lying down beside the Roxanne doll on the bed, with his arm over the Roxanne doll's body.

Monica asked Roxanne if she saw her father's "boy thing," and Roxanne said "yes." Monica asked Roxanne if her father's boy thing looked like the doll they were using, and Roxanne said "yes," but then grabbed the daddy doll's penis, put it in an erect position, and said, "This was up here." Monica and Roxanne then returned to the living room and went through the entire procedure with the dolls again in front of Priscilla Hornby. Roxanne later indicated that her father had been drinking beer prior to this incident. It was never determined exactly when this episode of sexual abuse might have occurred, except that it was sometime after May 28, 1985, and before June 15, 1985.

On August 21, 1985, Ferlin Dorian was indicted for rape, carnal knowledge, and

incest. Shortly thereafter, Priscilla Hornby informed Monica Whiting that Dorian was in jail, and that it would be safe for Roxanne to return home to live with her mother. Monica testified that she discussed going home with Roxanne, but failed to inform her that her father would not be there. According to Monica, Roxanne immediately became withdrawn, and started breaking household rules. However, as soon as Monica explained to Roxanne that when she went home, only her mother and brothers would be there, Roxanne became very well-behaved and verbal again.

Prior to trial in October 1985, the government notified Dorian and his attorney that it would seek to offer into evidence the statement Roxanne Dorian made to Monica Whiting on July 10, 1985, under one of the residual exceptions to the hearsay rule, Rule 803(24) or Rule 804(b)(5) of the Federal Rules of Evidence. The defense objected, and at trial, the government made an offer of proof. The district court reserved its ruling on the admissibility of the evidence until after Roxanne had testified. Thereafter, the five-year-old was called to the stand, but because of her age and obvious fright, she was unable to testify meaningfully. The district court, noting that her brief testimony had at least established a foundation—and a need—for further evidence, ruled that Monica Whiting's testimony regarding the July 10 statement was admissible under Fed.R.Evid. 803(24).

In addition to the evidence outlined above, Norma Dorian testified about an unusual event that occurred in June 1985. Norma explained to the jury that she was responsible for all the cooking, washing, and cleaning in the Dorian home. However, on one occasion in June, she found Ferlin washing Roxanne's underwear. She testified that her husband had never done that before, and that the underwear was the only thing he washed that day.

The jury found Ferlin Dorian guilty of the lesser included offense of assault with attempt to commit rape, and he received a ten-year sentence. This appeal followed.

## II. DISCUSSION.

### A. Admissibility of the Hearsay Testimony.

■ Dorian contends that the district court should not have permitted Monica Whiting to testify to the statements Roxanne made on July 10, 1985. As noted above, the district court admitted the extrajudicial statements as substantive evidence under Fed.R.Evid. 803(24), the residual or "catch-all" exception to the hearsay rule. We will reverse the district court only if admission of the evidence constituted a clear abuse of discretion. *See, e.g., United States v. Renville,* 779 F.2d 430, 439 (8th Cir.1985); *United States v. Cree,* 778 F.2d 474, 477 (8th Cir.1985).

This court has observed that for hearsay evidence to be admissible under Rule 803(24), it must satisfy five criteria:

The statement must have circumstantial guarantees of trustworthiness equivalent to the twenty-three specified exceptions listed in rule 803;

(2) The statement must be offered as evidence of a material fact;

(3) The statement must be more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable efforts;

(4) The general purposes of the Federal Rules and the interests of justice must best be served by admission of the statement into evidence;

(5) The proponent of the evidence must give the adverse party the notice specified within the rule.

*Renville,* 779 F.2d at 439. *See also Cree,* 778 F.2d at 477. Dorian contends that the challenged evidence (1) did not have the necessary guarantees of trustworthiness; (2) was not more probative than any other evidence the government could have procured through reasonable efforts; and (3) did not serve the purposes of the Federal Rules or the interests of justice. We reject these claims.

As Dorian points out, Congress intended the residual hearsay exception to "be used

very rarely and only in exceptional circumstances." S.Rep. No. 1277, 93d Cong., 2d Sess. 20, *reprinted in* 1974 U.S.Code Cong. & Ad.News 7051, 7065–66. *See also Renville,* 779 F.2d at 439. Nevertheless, the district court has a considerable measure of discretion in applying this exception. *See, e.g., Cree,* 778 F.2d at 477. *See also Huff v. White Motor Corp.,* 609 F.2d 286, 291 (7th Cir.1979). In the present case, the district court offered little explanation for its decision to admit the evidence, but after careful review of the record, we are convinced that the district court did not abuse its discretion.

### 1. Trustworthiness.

Dorian first argues that Roxanne's July 10, 1985 statement did not possess sufficient circumstantial guarantees of trustworthiness to be admissible under Rule 803(24). In particular, he emphasizes the length of time between Roxanne's description of the sexual abuse, and the date when any such abuse could have occurred (at least twenty-five days); the contradictions in the statements Roxanne gave during the various interviews (*e.g.,* indicating on June 19 that her father never put anything between her legs, on June 24 that he put his finger between her legs, and on July 10 that he put his "boy thing" between her legs); and the possibility that Roxanne's statement to Monica Whiting was the result of suggestiveness and pressure by the social workers. In addition, Dorian submits that the mere use of anatomically correct dolls is suggestive to a young child.

In *Renville,* another case involving the admissibility of a sexually abused child's hearsay statements under Rule 803(24) this court pointed out that, in assessing the trustworthiness of an out-of-court statement, we must examine the reliability of the declaration "in light of the circumstances at the time of the declaration and the credibility of the declarant." *Renville,* 779 F.2d at 440. In the present case, although Dorian's objections raise legitimate concerns, our review of the record reveals that the statement in question possessed sufficient guarantees of trustworthiness to be admissible under Rule 803(24).

To begin with, the women who interviewed Roxanne—including her foster mother, Monica Whiting—had received training in interviewing children and in the use of anatomical dolls.[10] All three testified that they were careful not to use leading or suggestive questions during any of the interviews. They also indicated that, because of Roxanne's withdrawn behavior and her obvious discomfort with sharing the things that frightened her, the initial interviews were stopped before they were complete. Indeed, it appears that the reason Roxanne did not make the challenged statement until July 10 was because she was able fully to reveal what had happened only after she had developed a relationship of trust with Monica Whiting.

[10] Although Monica was not a social worker, her background included experience in both teaching and child development. During college she worked with children in a mental hospital, teaching reading and other skills. (Tr. 161). She received training in child development as a high school home economics teacher. (Tr. 165). During the three years she had been licensed as an emergency foster parent, she had taken care of approximately 60 children. (Tr. 161–162). In addition, to maintain her certification as a foster parent, Monica attended a number of classes offered by the State Department of Social Services. (Tr. 166). Those classes included some training on interviewing children and the use of anatomical dolls. (Tr. 168).

Nor do the conflicts in Roxanne's statements necessarily render her July 10 statement untrustworthy. As a clinical psychologist testifying as an expert witness explained, the contradictions may well have been a function of Roxanne's concern about how the information would be received, and whether she would be punished for what she said. According to the psychologist, it frequently takes a long time for children to share what is really going on and they may then do so in stages, telling a little more each time. Furthermore, because defense counsel cross-examined Penny Virchow, Priscilla Hornby, and Monica Whiting extensively about the contradictions in Roxanne's statements and

the circumstances in which her statements were made, the jury was certainly in a position to consider those factors in deciding what weight to give her July 10 statement. *See Cree*, 778 F.2d at 478 n. 6.

However, the reliability of Roxanne's statement is perhaps best supported by the nature of her graphic but child-like description of the incident. In particular, we note Roxanne's statement that her father "put his boy thing in the hole between my legs," and her ability to describe an erect penis. As the clinical psychologist observed, an erect penis is not normally a matter within the knowledge of a five-year-old girl. The childish terminology Roxanne used, along with her demonstration of her father's actions, "has the ring of veracity, and is entirely appropriate for a child of [her] tender years." *United States v. Nick*, 604 F.2d 1199, 1204 (9th Cir.1979). Indeed, this court has held that "a declarant's young age is a factor that may substantially lessen the degree of skepticism with which we view [her] motives," and mitigates in favor of the trustworthiness and admissibility of her declarations. *Renville*, 779 F.2d at 441. *See also Roberts v. Hollocher*, 664 F.2d 200, 205 (8th Cir.1981); *United States v. Iron Shell*, 633 F.2d 77, 84 (8th Cir.1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). It is unlikely that Roxanne could have fabricated the story she told to Monica and repeated in front of Priscilla Hornby, and ordinary experience suggests that Roxanne would not have engaged in the behavior with the anatomically correct dolls that Monica Whiting observed absent some prior similar experience. *Cf. United States v. Short*, 790 F.2d 464 (6th Cir.1986) (testimony of social worker regarding conduct of three-year-old alleged sexual abuse victim in playing with anatomically correct dolls was not inadmissible hearsay).

Finally, we note that Roxanne's statement was corroborated by other evidence: the descriptions of her fearful behavior around men; her terror when the physician's assistant prepared to conduct a vaginal examination; her disturbed behavior when told she was going home, which stopped when she learned her father would not be there; Dorian's unprecedented act of washing Roxanne's underwear; and Norma's statements that Ferlin was trying to rape her daughter. Furthermore, the medical evidence, although inconclusive, was certainly consistent with sexual abuse. We therefore conclude that the requirement of trustworthiness was satisfied in this case.

### 2. Probative Value of the Evidence.

Dorian next contends that the government failed to make a reasonable effort to procure the most probative evidence about what occurred: Roxanne Dorian's testimony. He contends that the prosecution made very little attempt to elicit facts concerning the alleged offense during Roxanne's direct testimony, and that the defense was therefore denied an opportunity for a thorough cross-examination.

This argument is without merit. The record reveals that the government asked Roxanne a number of questions on direct examination, and made a good faith effort to present the evidence directly to the jury. However, it is clear from the record that the child was frightened and uncommunicative, especially when asked questions relating to sexual abuse. As Dorian acknowledges several times in his brief, Roxanne was simply unable to testify meaningfully at trial. Indeed, defense counsel must have reached the same conclusion at the time of the trial because he asked only four questions on cross-examination. In the circumstances, Roxanne's July 10 statement to Monica Whiting was the most probative evidence the government could have reasonably procured with regard to the charges of sexual abuse.

### 3. The Interests of Justice.

Finally, Dorian asserts that admission of the hearsay statement did not serve the general purposes of the Federal Rules of Evidence because it lacked circumstantial guarantees of trustworthiness, and did not serve the interests of justice because it

violated his sixth amendment right to confront witnesses against him. We have already rejected the first of these allegations and, for the reasons stated below, reject Dorian's constitutional claim as well. Although Roxanne was unable to testify meaningfully at trial, she was able to provide her version of the relevant events in the more relaxed environment of her foster home. *Cf. Cree,* 778 F.2d at 478. The need for the only available account of the abuse was apparent after Roxanne's limited testimony. We believe the interests of justice were duly served by the admission of the hearsay evidence where, as here, the other criteria of Rule 803(24) were satisfied.

### B. Confrontation Clause.

Dorian also claims that by admitting Monica Whiting's testimony, the district court violated his sixth amendment right to confront witnesses against him. He points out that because Roxanne was unable to testify meaningfully on direct examination, the defense was precluded from testing the truth of her July 10 statement on cross-examination. Thus, the question presented is whether the challenged evidence, even if admissible under Rule 803(24), nevertheless violates the rights guaranteed Dorian under the confrontation clause.

We find no indication in the record that Dorian objected at trial to admission of the statement on confrontation clause grounds. Defense counsel clearly objected to Monica Whiting's testimony on hearsay grounds (Tr. 142), but the only reference to the confrontation clause was made by the trial judge prior to the offer of proof. (Tr. 93–94). This court has held that "statements admitted into evidence in violation of the confrontation clause do not constitute grounds for reversal unless a timely and specific objection is made at trial." *United States v. McDaniel,* 773 F.2d 242, 245 (8th Cir.1985). *See also United States v. Helmel,* 769 F.2d 1306, 1316–17 (8th Cir.1985). Assuming that this rule applies in the context of the present case, Dorian would be entitled to relief only if the admission of

Monica Whiting's testimony constituted plain error. *See* Fed.R.Crim.P. 52(b). To find such error we would have to conclude that admission of the hearsay testimony constituted a miscarriage of justice. *McDaniel,* 773 F.2d at 245; *Helmel,* 769 F.2d at 1317. However, after reviewing the record, we cannot say that admission of Roxanne's statement constituted error at all. Thus even if, as the dissent suggests, this issue was properly preserved for appellate review, our conclusion would be the same.

■■■ Although the Supreme Court has emphasized the importance of face-to-face confrontation in criminal trials, it has also recognized that the confrontation clause neither bars the admission of all out-of-court statements, nor requires that all declarants be subject to cross-examination. *See Ohio v. Roberts,* 448 U.S. 56, 63–66, 100 S.Ct. 2531, 2537–39, 65 L.Ed.2d 597 (1980). A hearsay statement is constitutionally admissible if (1) the prosecution can "either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant," and (2) the statement bears adequate "indicia of reliability." *Id.* at 65–66, 100 S.Ct. at 2538–39. Where the evidence falls within a firmly rooted exception to the hearsay rule, reliability can be inferred; otherwise, the evidence must be excluded "absent a showing of particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. at 2539.

■■■ In the present case, we believe both the requirements set forth in *Ohio v. Roberts* for admissibility under the confrontation clause were satisfied. The prosecution produced Roxanne as a witness at trial, but she was simply too young and too frightened to be subjected to a thorough direct or cross-examination. The trial court made no specific ruling on Roxanne's availability as a witness following her testimony because the confrontation clause issue was not expressly raised by defense counsel. However, it is clear from the record that Roxanne was, for all practical purposes, "unavailable." Indeed, courts have recognized

a special type of "unavailability" for purposes of the confrontation clause in similar cases. *See Iron Shell*, 633 F.2d at 87. *See also Nick*, 604 F.2d at 1202. Furthermore, even assuming that Rule 803(24) may not be considered a "firmly rooted hearsay exception," and therefore the reliability of Roxanne's statement may not simply be inferred, we believe the same factors that render her statement trustworthy for purposes of admissibility under Rule 803(24) also constitutes a "showing of particularized guarantees of trustworthiness" sufficient to satisfy the requirements of the confrontation clause.

We note, moreover, that the Supreme Court has construed the confrontation clause in a pragmatic fashion, recognizing the need to balance the rights of the accused against the public's "strong interest in effective law enforcement." *Ohio v. Roberts*, 448 U.S. at 64, 100 S.Ct. at 2538. That interest is nowhere stronger than in the case of defenseless child abuse victims. *Cf. Cree*, 778 F.2d at 478 n. 7. Weighing these competing interests in the circumstances of the present case, we conclude that the hearsay testimony was constitutionally admissible. The challenged statement had sufficient indicia of reliability to afford the jury "a satisfactory basis for evaluating the truth of the prior statement," *California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970), and thus substantially complied with the purposes behind the confrontation requirement. *See Ohio v. Roberts*, 448 U.S. at 69, 100 S.Ct. at 2540.

Accordingly, the judgment of the district court entered pursuant to the jury verdict is affirmed.

BRIGHT, Senior Circuit Judge, dissenting.

I dissent.

The critical evidence in the prosecution's case against Ferlin Dorian for the sexual assault of his daughter, Roxanne Dorian, consisted of testimony provided by Monica Whiting, Roxanne's foster mother. This testimony did not, however, exhibit that indicia of reliability necessary for its admissibility under the sixth amendment's confrontation clause.

## I.

I begin by addressing the issue of whether the error under the confrontation clause was preserved. Even in the absence of a timely and specific objection by the appellant Ferlin Dorian, the record plainly demonstrates that the confrontation clause issue was before the court at the time of trial.

First, the district judge specifically noted the existence of a confrontation clause problem were the Government to call Monica Whiting to the stand and not call Roxanne. At the onset of the Government's offer of proof concerning Monica Whiting's testimony, the judge stated, "Do you understand we have a potential problem with the confrontation clause * * * they [the defense] won't be able to cross-examine the child if the only evidence offered was that of a questioner." (Tr. 93–94).

Second, the manner in which the appellant's counsel objected to Monica's testimony on hearsay grounds put the Government on notice that the basis of his objection was the testimony's lack of trustworthiness. Under *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), lack of trustworthiness is also a ground for a hearsay objection under the confrontation clause. The objection and its accompanying dialogue were as follows:

MR. ELLINGSON [appellant's attorney]: Your Honor, I guess I'm wondering in light of the fact that she [Roxanne Dorian] testified, this indicates the Court made a decision on the admission of the hearsay evidence?

THE COURT: Yes. I rule that the offer of proof, that is, the testimony offered during the offer of proof is admissible under 803[24].

MR. ELLINGSON: If I could, I'd like to state an objection to the admission of this evidence that it does not qualify as an exception to the hearsay rule on the

grounds that the Government has made no showing that it has an equivalence of trustworthiness as shown as indicative of the other hearsay exceptions.

THE COURT: Yes. You may put that on the record.

MR. ELLINGSON: I would like to have a continuing objection to her testimony on that basis.

THE COURT: You can have that objection.

(Tr. 142).

With the focus on "trustworthiness", the failure of Ferlin Dorian's counsel to make a specific and timely objection on confrontation grounds does not bar our addressing the confrontation issue. "Objections", one court has stated, "caution the opposing party to prevent error and avoid misconduct and alert the court to take corrective action." *United States v. Berry*, 627 F.2d 193, 199 (9th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981). In the context of the admission of hearsay in a criminal trial, an objection on confrontation clause grounds alerts the government to the need of presenting proof of the declarant's unavailability. *United States v. Gibbs*, 739 F.2d 838, 847 (3d Cir. 1984) (en banc), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985). Where only a hearsay objection has been made, the government often will not establish the declarant's unavailability. Thus, in these situations, it will not do for the appellant to shift the grounds of objection to the confrontation clause where unavailability of the declarant must be shown by the government to overcome the confrontation clause objection. *See Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. Unavailability of the declarant is irrelevant to the introduction of evidence under most exceptions to the rule against hearsay, including Fed.R.Evid. 803(24).

The proceedings of the trial demonstrate that here the Government prepared itself for a confrontation clause objection. The Government established Roxanne's unavailability by placing her on the stand and demonstrating that her testimony was essentially meaningless.

The two cases cited by the majority to support non-reviewability of the confrontation issue, unless raised in the trial court, *United States v. Helmel*, 769 F.2d 1306 (8th Cir.1985) and *United States v. McDaniel*, 773 F.2d 242 (8th Cir.1985), are thus inapplicable to the present case. In *Helmel*, the court held that since the government was not alerted to the necessity of establishing the identity of the declarant and his unavailability at trial, a consequence of the appellant only objecting to the evidence on hearsay grounds, the court was barred from reviewing the confrontation clause issue on appeal. 769 F.2d at 1317. The court in *McDaniel* stated the same reason for its refusal to review the confrontation clause issue raised by the district court's admission of a co-conspirator's statement pursuant to a hearsay exception. 773 F.2d at 245. Because, as noted above, the Government established the declarant's (Roxanne's) unavailability at trial, it is in no way prejudiced by our review of the confrontation clause issue.

That the appellant's counsel failed to mention the Constitution in his objection is of no moment. The tests for the admissibility of hearsay testimony under the confrontation clause and the residual hearsay exception are nearly identical. Under both the Constitution and Rule 803(24), the question is whether the out-of-court statements are sufficiently reliable and trustworthy to hazard their admission without an opportunity for the defendant to cross-examine the declarant. Indeed, the Supreme Court has stated that while the test for admissibility under each are distinguishable, "hearsay rules and the Confrontation Clause are generally designed to protect similar values", *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970), and "stem from the same roots", *Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970). *See also United States v. Nick*, 604 F.2d 1199, 1203 (9th Cir.1979) (Rule 803(24) provides a useful set of criteria for weighing the admissi-

bility of evidence under both the confrontation clause and the hearsay rule).

Finally, the Government in its brief does not contend that the defendant failed to preserve the confrontation issue. Rather, consistent with its presentation of the evidence in the district court, the Government addresses the merits of the confrontation clause issue. I observe that the majority also addresses the issue, even while contending the constitutional question is a non-issue.

Accordingly, the crucial issue for resolution on this appeal is whether the trial court erred in permitting Monica Whiting to relate her hearsay version of what information Roxanne, age five, conveyed to her. Whether the court's ruling constituted a confrontation clause violation is properly before us, just as much so as the question of its correctness under the Federal Rules of Evidence. I deem it only necessary, however, to discuss the issue in terms of the sixth amendment.

## II.

In addressing confrontation clause values, courts must draw a line between hearsay testimony that violates the Constitution and hearsay testimony that preserves the accused's sixth amendment right to be confronted with the witnesses against him. Because the testimony of Monica Whiting, while honestly and sincerely given, carried with it such aspects of unreliability, it does not pass constitutional muster under *Ohio v. Roberts.*[1]

I observe the following bearing on the "indicia of reliability" displayed by Monica Whiting's testimony.

First, Monica Whiting cannot be considered an objective observer. Between Roxanne and Monica existed a strong foster mother-daughter relationship although Roxanne had been living as a member of the Whiting household for less than a month at the time of Roxanne's interviews. Despite this bond, it was Monica who conducted the interviews of Roxanne which sought, as their purpose, to learn whether Ferlin Dorian had sexually abused his daughter. The relationship between Monica and Roxanne may have influenced Roxanne to relate statements to please, or which she thought might please, Monica, regardless of Monica's sincere desire to obtain truthful information.

Second, because Monica, to whom Roxanne first gave her version of the assult, was not at the time a qualified social worker and possessed minimal experience interviewing children, her efforts to elicit the facts of the incident from Roxanne cannot be considered a reliable interrogation. At trial, Monica testified that subsequent to her first interview with Roxanne, but before the July 10, 1985 interview, she attended one lecture on the interviewing of children given by a State Social Services agent. (Tr. 160, 166). Monica conceded that her instruction with regard to the use of anatomical dolls, which she used to facilitate her interviews with Roxanne, was "limited". (Tr. 168). She also stated that she had never before been involved in this type of interviewing. (Tr. 162). Monica's lack of qualifications and experience in child interviewing detracts from the reliability of the story she obtained from Roxanne.

Third, Roxanne was interviewed amidst what appears to have been considerable suggestiveness by Monica, Priscilla Hornby, the Supervisor for the South Dakota Department of Social Services and Penny Virchow, an on-call child protection worker in the same state agency. In her initial interview, Roxanne was asked whether her father touched her while her mother was gone. (Tr. 194). In a later interview, she was asked whether her father touches her

---

1. I do not discuss whether, under *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), hearsay under Rule 803(24) is judged to fall outside established hearsay exceptions and thus to require "particularized guarantees of trustworthiness," or whether it must exhibit sufficient "indicia of reliability" where the hearsay exception is determined "firmly rooted". Monica Whiting's testimony lacks the necessary predicate of reliability necessary to comply with either standard.

any place on her body and whether that touch hurts or scares her. (Tr. 195–96). At still another interview, Roxanne was asked by a social worker, "Is this a scary place that your dad touched you?" (Tr. 208). She was also asked if her father ever put anything between her legs. (Tr. 209). Moreover, many of the questions put to Roxanne were asked through the manipulation of anatomically correct dolls. While I would not go so far as to hold, as the appellant urges, that the mere use of anatomically correct dolls is *per se* suggestive, the record of Roxanne's interviews indicates that the use of these dolls to question a very young child adduces a relatively high degree of suggestiveness.

Fourth, Roxanne's own statements, as related by Monica, are too inconsistent to be afforded any significant amount of reliability. During the interview of June 17, 1985, Roxanne indicated that her father did not touch her any place on her body to scare her except her chest. (Tr. 196). During the interview conducted on June 19, 1985, Roxanne indicated that her father had never put anything between her legs. (Tr. 209). During her June 24, 1985 interview, Roxanne indicated that her father had placed his finger in the opening between her legs. (Tr. 182). Finally, during the course of an interview conducted on July 10, 1985, Roxanne told Monica Whiting that her father had put his "boy thing" in the "hole" between her legs. (Tr. 155).

In an effort to explain these inconsistencies at trial, the Government called an expert witness to testify that contradictions in a child's statements do not necessarily indicate a lack of trustworthiness. Children, testified this expert, will often contradict themselves in their desire to tell an adult about something scary that has happened to them without being punished for what they believe is their wrongful involvement in the incident. As a child receives assurances that he will not be punished and will instead be believed, the expert testified that he will gradually tell an adult the real truth of what occurred. (Tr. 260–63). The Government's expert spoke only of children in general, however, and not of Roxanne in

particular. Thus we have no idea whether these behavioral assumptions even apply to Roxanne. The expert did not and could not testify whether Roxanne's statements were true or false. Moreover, the very need for an expert witness to testify to the credibility of children's stories told in an inconsistent manner demonstrates the unreliability of the declaration here offered in evidence.

Finally, the medical evidence presented during the trial does not support Monica's testimony. In her June 17, 1985 examination of Roxanne, Dr. Melanie Webb found the entrance to Roxanne's vagina inflamed and the tissue on the hymenal ring surrounding Roxanne's vagina torn. Dr. Webb testified, however, that, based only on this evidence, it was impossible to conclude that Roxanne had been raped. The redness, Dr. Webb stated, could have been caused by poor hygiene, and the vaginal tear, a result of the penetration of any object, by horseback riding or a fall. (Tr. 56–58). She further stated that the tear could have occurred anywhere from a year to five or six days prior to the June 17, 1985 examination. (Tr. 55). The Government claimed that the sexual abuse, if any, occurred between May 28 and June 15, 1985. (Tr. 220). Thus the medical testimony could not corroborate the declarations of Roxanne as repeated by Monica's testimony.

### III.

In upholding the district court's admission of Monica Whiting's testimony, the majority cites several cases in which this court approved the admissibility of hearsay testimony repeating statements of young children because the statements were accompanied by substantial guarantees of trustworthiness. *See United States v. Cree,* 778 F.2d 474 (8th Cir.1985); *United States v. Renville,* 779 F.2d 430 (8th Cir. 1985); *United States v. Iron Shell,* 633 F.2d 77 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). In each of these cases, however, the admitted testimony displayed a degree

of trustworthiness missing from Monica Whiting's testimony.

In *Cree*, as in the present case, testimony concerning statements made by a four-year-old child abuse victim were admitted into evidence under the residual hearsay exception. In contrast to the present case, however, the child's statements implicating his custodian and her boyfriend in physically abusing himself and his brother were made to a qualified clinical social worker. *Cree*, 778 F.2d at 476. Furthermore, there seems to have been no danger that this social worker influenced the child to make the statements he did, there being no evidence that the child was at all dependent upon this social worker emotionally. Moreover, the child's statements in *Cree* were direct, unambiguous and related verbally. *Id.* This is to be compared with Roxanne's inconsistent statements, mostly communicated through the use of anatomical dolls or nods and shakes of her head.

The child's allegations of physical abuse in *Cree* were also corroborated by decisive medical evidence and the testimony of other witnesses. Corroboration has been held an "indicium of reliability" in confrontation clause analysis. *Barker v. Morris*, 761 F.2d 1396, 1402 (9th Cir.1985). Basing their statements on the observations they made during separate physical examinations of the two children, three physicians testified that the children were victims of child abuse. *Cree*, 778 F.2d at 476. The child's statements to the social worker were also substantiated by similar comments made by the child to school officials and to an examining physician, also alleging his abuse was caused by his custodian. *Id.* Here, by contrast, there exists no medical evidence or testimony by other witnesses that corroborates the truth of the statements Roxanne made to Monica.

In *Renville*, this court upheld the admission of the hearsay testimony of a deputy sheriff under the residual hearsay exception. The hearsay concerned statements made to the deputy sheriff by a young teenage sexual abuse victim. The court held that "significant indicia of reliability" supported the testimony's admissibility, despite the declarant's testimony at trial that she had lied to the deputy sheriff. *Renville*, 779 F.2d at 440. Of greatest importance to the court's decision, and not found in the present case, was the declarant's subjection, in *Renville*, to full and effective cross-examination. During the course of this cross-examination, the declarant even admitted making the controverted statements to the deputy sheriff. *Id.* Also contrasting the present case, the declarations at issue in *Renville* were made by the young victim to a deputy sheriff acting in the scope of his duties. *Id.* at 441.

Finally, the girl's statements to the deputy sheriff in *Renville* were corroborated by numerous state and medical personnel to whom the girl had made identical statements at different times and in different settings. *Id.* at 440–41. The *Renville* court upheld, under the hearsay exception admitting statements made for purposes of medical diagnosis or treatment, Rule 803(24), the admission of an examining physician's testimony concerning statements, made to him by the victim, in which the victim identified her abuser. The corroboration that the victim's statements to the doctor lent to the deputy sheriff's testimony significantly added to its reliability.

In the third case, *Iron Shell*, this court upheld the admission, under the hearsay rule for excited utterances, of a police officer's testimony pertaining to statements made to him by a nine-year-old sexual abuse victim. Contrasting the timing of Roxanne's interviews, occurring anywhere from one to four weeks after the alleged sexual assault, the girl in *Iron Shell* described the events to the officer between forty-five minutes and an hour and a quarter subsequent to their occurrence. 633 F.2d at 77. The officer testified that, at the time of the interview, the girl was still noticeably shaken by some terrifying event. *Id.* at 85. Also, unlike the manner in which Roxanne was interviewed, where she was asked leading and possibly suggestive questions, the officer in *Iron Shell* asked the girl only "what happened?" *Id.*

at 86. Finally, as in *Renville*, the girl's identical account of the assault given to an examining physician to which the physician testified at trial (and which was admitted by the trial court under Rule 803(24)) substantially corroborated the police officer's testimony.

## IV.

We here deal with a constitutional admonition that an accused possesses the right "to be confronted with the witnesses against him." In determining whether the proffered testimony carries with it sufficient indicia of reliability to qualify for admissibility, the courts must draw a realistic line. Here, the inconsistent statements—drawn from a young child after repeated questioning and without the aid of corroborating statements elsewhere in the record—must fall on the side of inadmissibility. Were it otherwise, the important constitutional guarantee would be made empty of meaning.

I would reverse and remand for a new trial without the inadmissible testimony of Monica Whiting.