**Brian NELSON, Petitioner–Appellee,**

v.

**Catherine FARREY,
Respondent–Appellant.**

**No. 88–2292.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1989.

Decided May 17, 1989.

Rehearing and Rehearing En Banc
Denied June 21, 1989.

Michael R. Rioss, Asst. Atty. Gen., State of Wis., Dept. of Justice, Madison, Wis., for petitioner-appellee.

Martin I. Hanson, Hanson Gasiorkiewicz & Becker, S.C., Racine, for respondent-appellant.

Before WOOD, Jr., POSNER and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

A Wisconsin jury convicted Brian Nelson of first-degree sexual assault on his daughter, "T.," who had been three years old at the time of the crime. The judge sentenced Nelson to five years in prison. After exhausting his state remedies, see *State v. Nelson*, 138 Wis.2d 418, 406 N.W.2d 385 (1987), Nelson sought federal habeas corpus. The district court held that he had been convicted in violation of his rights under the confrontation clause of the Sixth Amendment ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him"). 688 F.Supp. 1304 (E.D.Wis.1988). T. had not testified at Nelson's trial, but statements that she had made to a psychologist had been admitted into evidence through the psychologist's testimony, improperly in the district judge's view. The state appeals.

A growing sensitivity to the prevalence of child abuse in our society has caused an upsurge of prosecutions. See generally Note, *To Keep the Balance True: The Case of Coy v. Iowa*, 40 Hastings L.J. 437 (1989). Such prosecutions place a strain on traditional notions of procedural justice. See, e.g., Mosteller, *Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment*, 67 N.C.L. Rev. 257 (1989); Tuerkheimer, *Convictions Through Hearsay in Child Sexual Abuse Cases: A Logical Progression Back to Square One*, 72 Marq.L.Rev. 47 (1988). This is especially so when, as in the present case, the crime has left no physical traces, the child is very young and is directly or indirectly the principal witness against the alleged abuser, and the case involves incest, thus pitting child against parent.

Brian and Susan Nelson, T.'s parents, were divorced in 1982, when T. was two years old. Susan received custody of the child, and Brian received visitation rights. According to Susan Nelson's testimony, beginning in August 1983 T. would become apprehensive and even hysterical when Brian Nelson came to pick her up. After one of the visits T. begged her mother not to make her go to her father's house again. By October, T. would go "berserk" when told she was going to her father's house; she would cry and scream and beg not to be forced to go. The visits ceased for a time but resumed around Christmas. Shortly after their resumption, T. tried to pull her mother's pants down while playing tag, explaining that daddy had taught her to play tag this way. T. also insisted to her mother that a picture of Michael Jackson, the popular singer, be brought into the bathroom to watch her. T. pointed to her vagina and said that Michael Jackson doesn't look like this and "daddy doesn't look like this either." When her mother asked her how she knew this, T. replied, "I pulled his underpants down." Susan told T. it must have been an accident, but T. insisted that daddy had told her to pull down his underpants and that it was all right because Cheryl (the defendant's new wife) was not at home. T.'s visits to her father now ceased for good. Suspecting that Nelson was sexually abusing T., Susan retained Dr. Donald McLean, a clinical psychologist whose name Susan had been given by the domestic relations court when she had asked the court whether she "had to force" T. to visit Brian Nelson.

All this was according to Susan Nelson, to whose testimony the defendant did not object. The spotlight now switches to Dr. McLean, who testified for the state as an

expert witness and whose testimony was objected to on the grounds both that it was inadmissible hearsay and that its admission infringed Nelson's constitutional right to confront his accuser.

McLean had held 59 evaluation and treatment sessions with T. between January and September 1984. (The sessions ended on the eve of Brian Nelson's criminal trial; he had been indicted in April.) The sessions were conducted mainly in McLean's "play therapy room," which was equipped with dolls and other toys. "Play therapy" is an established technique for obtaining information about the feelings and problems of young children. See, e.g., Axline, Play Therapy: The Inner Dynamics of Childhood (1947). According to McLean's testimony, T. revealed at several sessions that (in his words) she had "touched daddy where he went to the bathroom." McLean placed "anatomically correct" male and female dolls in the play therapy room and T. in one of the early sessions placed the female doll's face against the male doll's genitalia and said, "she gets mud on her face." Asked what she meant, she replied, "it's white and sticky." T. told McLean that her father had told her not to talk about the incident and also had told her to say that Mitch (Mitchell Blada, who had moved in with Susan after the divorce) had done it.

McLean related the following conversation he had had with T. at one of the sessions: "Do you pull someone's underpants down and touch him where he goes to the bathroom, and the child said yes ... and I said, well, who is it that you touch where he goes to the bathroom, and the child answered Mitch. And I said you told me it was Daddy. Was it Mitch or Daddy, and the child said Daddy. And I said then why did you say Mitch, and she said it was Mitch, and I said then it was not Daddy. She said it was Daddy, then Mitch, then Daddy, and she answered with he told me to say it was Mitch. I said who told you to say it was Mitch. She said Daddy." When Dr. McLean asked T. whether she would tell only the truth to anyone who talked to her, she replied, "I don't have to tell the truth." McLean further testified that throughout the sessions T. was very anxious, and that she was both reluctant to talk about the incidents involving her father and very hostile to him. At one session, after again describing fellatio with her father in the bathroom, she became extremely agitated and said she was "mad" at her father. She began beating the male anatomically correct doll and throwing it around the room. She said she was beating "Daddy Brian."

The state called another clinical psychologist, Dr. Burton Silberglitt, as an expert witness. The defendant did not object to his testimony, which was based on a single interview with T. in March 1984. Dr. Silberglitt testified that T. had tried to avoid discussing her father because, in his words, it was "discomforting to her and frightening to her and traumatic to her to get into this." She had, however, told Silberglitt that she "played with his thing that he put in the toilet." Silberglitt also testified that T. had said, referring to her father, that "whatever came out of his pants was sticking out, and [she] indicated to me, you know, made a motion of an erect penis." He also testified that T. was very agitated and required therapy. Another witness who testified for the state without objection was a social worker, Mary Anne Jensen. She testified that in January 1984 T. had drawn a picture of herself and her father. The picture, which was admitted into evidence without objection, depicts the defendant as an erect penis.

When the state rested its case, Nelson moved for dismissal on the ground that the testimony about what T. had said was hearsay and that the state had failed to show that T. was unavailable to testify either in person or, at the very least, through a videotape of the play therapy sessions; therefore the admission of the hearsay violated his right of confrontation. (But of course a videotape would not have cured the absence of confrontation.) The judge denied the motion to dismiss, ruling that T.'s age—four at the time of trial—and the testimony of the two psychologists concerning the traumatic impact on her of having to testify about her father's conduct made her unavailable to testify at trial, and

concluding that therefore her out-of-court statements were admissible.

The trial then resumed, and two psychologists testified for the defense. Dr. David Nichols, who had interviewed T. in March 1984 at Nelson's request, testified that the interview had revealed little about the alleged sexual assaults but that T. had told him that she did not like to visit her father and that she "gets white mud on her face." Nichols had concluded that sexual abuse had occurred, and had recommended to the domestic relations court that Nelson not be permitted to visit with T. The other psychologist, Dr. Walter McDonald, had not interviewed T. but had examined Dr. McLean's clinical notes. McDonald agreed that T. was suffering from anxiety, anger, and trauma, but speculated that her increasing sexual preoccupation during the therapy sessions with McLean might have been a consequence of the presence of anatomically correct dolls. He acknowledged, however, that this theory was no more plausible than McLean's, which was that the defendant *had* sexually abused T.

After the trial, Nelson asked the trial judge to set aside his conviction, and in April 1985 the judge held an evidentiary hearing to determine once again whether T. had been unavailable to testify at the trial. The only witness called by either side was Dr. McLean (the state called him), who testified that T. would not have responded to direct questioning about the sexual contacts with her father, that such questioning could have had a traumatic effect on her, that she was fearful of her father, and that his presence in the courtroom while she testified would have harmed her psychologically. McLean acknowledged that therapy sessions with T. could have been videotaped but pointed out that a large number of the sessions would have had to be taped, because she had volunteered information about the sexual incidents with her father only gradually and intermittently. Nelson declined to present any evidence on the question of T.'s availability to testify at his trial, arguing that the seven-month lapse of time between the trial and the hearing prevented him from adducing meaningful evidence. The judge disagreed, and concluded that T. had indeed been unavailable to testify at trial.

■ Whether the Supreme Court of Wisconsin correctly found that the admission into evidence of T.'s statements to Dr. McLean did not violate Wisconsin's hearsay rule is an issue of state law; it is nothing to us. The only question for us is whether the admission of those statements, as the district court believed, denied Brian Nelson his Sixth Amendment right (held applicable to state prosecutions in *Pointer v. Texas*, 380 U.S. 400, 403–04, 85 S.Ct. 1065, 1067–68, 13 L.Ed.2d 923 (1965)) to confront the witnesses against him. In a literal sense it did not, since T. was not a witness. The prosecution witnesses were Nelson's ex-wife, the two psychologists called by the state, and the social worker. Nelson had every opportunity to confront *them*—to look them in the eye and make them quail under his righteous gaze. This case is not like *Coy v. Iowa*, —— U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), where the child witnesses testified behind a screen that prevented the defendant from establishing eye contact with them. It is true that T. was an indirect witness, but if the per se rule of *Coy* were extended to indirect witnesses—that is, to out-of-court declarants—the effect would be to outlaw all hearsay evidence, something the Supreme Court plainly is not minded to do.

If the literal sense of the confrontation clause were its only sense, Nelson would have no case. He would be entitled to confront only those persons who actually testified at his trial, and T. was not one of them. But interpreted literally the clause could easily be evaded: instead of calling eyewitnesses to a crime to testify, the state could put on witnesses who would merely recite what those eyewitnesses had told them. This might not be the end of the world. The defendant might be able to use his Sixth Amendment right of compulsory process (held applicable to the states in *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)) to get the eyewitnesses into court, where he could confront them. See Westen, *The Compulsory Process Clause*, 73 Mich.L.Rev. 71,

183 (1974). Of course, this would require a nonliteral reading of the compulsory process clause, which as written merely entitles the defendant "to have compulsory process for obtaining witnesses *in his favor*" (emphasis added), and we are speaking here of *prosecution* witnesses. This approach would also require that the compulsory process clause be read to have abrogated the common law rule that forbids a party to impeach any witness called by him; in other words it would require constitutionalizing Rule 607 of the Federal Rules of Evidence. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), suggests that the voucher rule does indeed violate the Sixth Amendment—but the confrontation clause, not the compulsory process clause. Additional interpretation would be required to expand the compulsory process clause from a help in mounting a defense (see, e.g., *Pennsylvania v. Ritchie,* 480 U.S. 39, 55–56, 107 S.Ct. 989, 1000–01, 94 L.Ed.2d 40 (1987); *United States v. Davis,* 772 F.2d 1339, 1347–48 (7th Cir.1985)) to a help in confronting the prosecution's nontestifying witnesses. See *United States v. Oates,* 560 F.2d 45, 82 n. 39 (2d Cir.1977). This may be why *Chambers* suggests that the voucher rule, which limits the defendant's ability to cross-examine eyewitnesses whom the prosecution declines to call, offends against the confrontation clause rather than against the compulsory process clause. There is no escaping the uncertainties of interpretation by switching the focus from the confrontation clause to the compulsory process clause.

■ At all events the law has developed along different lines. The confrontation clause has been held not only to entitle the criminal defendant to confront (literally) and cross-examine the witnesses whom the prosecution does call, but also to place limits on the prosecution's use of hearsay evidence. But it is not clear what those limits are. In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court said that hearsay evidence was inadmissible against a criminal defendant unless the declarant was unavailable to testify *and* the hearsay evidence was reliable; moreover, evidence that did not fit

within a well-established exception to the common law rule excluding hearsay evidence would be deemed reliable only if it had "particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. at 2539. The Court hedged the requirement of unavailability, however, by prefacing it with the statement: "In the usual case," *id.* at 65, 100 S.Ct. at 2538—rather a backhanded allusion to the fact that Rule 803 of the Federal Rules of Evidence contains 24 exceptions to the requirement that the declarant be unavailable to testify in order for hearsay to be admissible, and presumably the Constitution imposes looser rather than tighter limitations on the use of hearsay evidence than the Federal Rules of Evidence. Six years later the Supreme Court disavowed any suggestion that *Roberts* had stated a general rule, confined the case to the particular situation presented by it—a prosecutor's attempt to use the transcript of testimony from a previous judicial proceeding in lieu of live testimony at trial—and allowed the admission of out-of-court statements by a co-conspirator who was available to testify. See *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

■ At present, then, there is no single authoritative criterion for when the admission of hearsay evidence violates a defendant's constitutional right to confrontation. We can imagine two possible approaches. One would be to confine the right to situations in which the prosecutor appears to be trying to circumvent the literal right of confrontation (the right vindicated in *Coy* ) by presenting evidence at second hand, as in the hypothetical eyewitness case that we gave earlier, or in the *Roberts* case itself. As noted by Justice Harlan in a scholarly concurring opinion in *California v. Green,* 399 U.S. 149, 180, 90 S.Ct. 1930, 1946, 26 L.Ed.2d 489 (1970), "the early decisions that consider the confrontation right at any length all involved ex parte testimony submitted by deposition and affidavit." "[T]he paradigmatic evil the Confrontation Clause was aimed at [was] trial by affidavit." *Dutton v. Evans,* 400 U.S. 74, 94, 91 S.Ct. 210, 222, 27 L.Ed.2d 213 (1970) (Harlan, J.,

concurring). See also *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895). Trial by affidavit conjures up the image of inquisitorial procedure, and in this light *Coy* can be understood as a symbolic vindication of the adversary character of Anglo–American criminal procedure—symbolic because the trial of Coy was neither a trial by affidavit nor an inquisitorial-type proceeding. See *The Supreme Court, 1987 Term: Leading Cases,* 102 Harv.L.Rev. 143, 158–59 (1988). Admittedly that is not the timbre of the *Coy* opinion. The Court's emphasis is on the etymology of "confrontation" rather than on the symbology of the adversarial process. See 108 S.Ct. at 2800. But the Court was not dealing with a case in which the state had attempted to substitute an inquisitorial process for the adversary process that is the norm in Anglo–American criminal justice.

Under what we are calling the "symbolic" approach a heavy emphasis would be placed on the out-of-court declarant's unavailability to testify. For if he were available yet not called, it would look as if the state were trying to circumvent the adversarial process gratuitously.

■ The other approach, which is functional rather than either symbolic or literal, which focuses on cross-examination rather than (more precisely, in addition to) the making of eye contact with the prosecution's witnesses, and which also has considerable support in the cases, see, e.g., *Olden v. Kentucky,* —— U.S. ——, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (per curiam), is to forbid the admission of hearsay evidence so likely to be unreliable that it threatens a miscarriage of justice, which is to say, the conviction of an innocent person. See, e.g., *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). The declarant's availability or unavailability is relevant under this approach only insofar as it bears on the appropriateness, in particular circumstances, of introducing evidence potentially less reliable than that of a witness testifying about his first-hand knowledge. On this approach the declarant's unavailability cuts both ways: it makes the admission of the out-of-court statement more needful, because the prosecution can't get the declarant to testify in person, but it also makes cross-examination of the declarant impossible.

■ Under either approach, Nelson must lose. Begin with the symbolic approach. The prosecutor was not trying to present T.'s testimony through surrogates so that Nelson would not be able to look her in the eye at trial or cross-examine her. There was no attempt to circumvent adversary process. Whether or not T. was "unavailable" in the sense in which this term is used in Rule 804 of the Federal Rules of Evidence or in its Wisconsin counterpart— and bear in mind that "unavailable" doesn't mean dead or a fugitive, but includes fearing for one's life, as in *United States v. Boulahanis,* 677 F.2d 586, 588 (7th Cir. 1982), or risking incriminating oneself, as in *United States v. Silverstein,* 732 F.2d 1338, 1346 (7th Cir.1984)—Nelson does not suggest that the prosecutor had improper motives in failing to call T. as a witness, or even that a reasonable observer would have ascribed such motives to the prosecutor. Dr. McLean testified that T. would resist direct questioning about sexual incidents with her father. To elicit truthful answers, he opined, would have required protracted inquiry in a relaxed setting— conditions impossible to create in a courtroom with T.'s father present. The attempt to extract evidence from her in a courtroom setting was likely to be not only futile but also psychologically harmful to her.

■ Turning to the second approach, the functional, we ask whether the evidence of what T. had told other people—her mother, the three psychologists (including Dr. Nichols, one of the defendant's expert witnesses) who interviewed her, and the social worker—was sufficiently reliable to still concerns that Nelson may have been the victim of a miscarriage of justice. The Wisconsin courts thought it was, and so do we. Remember that the only challenged testimony is that of Dr. McLean. The other hearsay evidence, much of it as damning as McLean's, was admitted without objec-

tion. Some of that evidence was given by Dr. Nichols, who was Nelson's own witness. The hearsay evidence that was admitted without objection provided strong corroboration for the statements that T. had made to Dr. McLean. The only suggestion that she might have fabricated her account of sexual abuse was Dr. McDonald's testimony that playing with anatomically correct male and female dolls might have caused T. to become preoccupied with sex. McDonald is not alone in being concerned that the use of such dolls "will stimulate fantasy and not recall," Christiansen, *The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews*, 62 Wash.L.Rev. 705, 711 (1987), but that concern is misplaced in the circumstances of the present case. For there cannot be any serious doubt that *someone* coerced T. into committing fellatio with him. Merely playing with anatomically correct dolls would not have given her the idea that one might be sprayed in the face with "white mud" from an erect penis; the dolls aren't *that* anatomically correct. The experience that T. narrated must have happened. The only question is whether Mitch or her father was the molester. And Dr. McDonald did not suggest that Mitch and Susan had attempted to frame Daddy Brian.

The question is not whether T.'s statements to McLean were in fact completely truthful and accurate, although the evidence admitted without objection makes it highly probable that they were. (And it appears that children rarely fabricate reports of sexual abuse. See Note, *Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses*, 68 B.U.L. Rev. 155, 175–76 (1988); Comment, *Child Witnesses in Sexual Abuse Proceedings: Their Capabilities, Special Problems, and Proposals for Reform*, 13 Pepperdine L.Rev. 157, 158–60 (1985); Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases*, 83 Colum. L.Rev. 1745, 1751–53 (1983)—all reviewing empirical studies.) The question is whether allowing the statements into evidence created a serious danger of a miscarriage of justice. Dr. McLean is a qualified psychologist who treated T. over a period of months, conducted dozens of therapy sessions with her, and employed his professional skills in an attempt to elicit truthful statements. No one pretends that such a sifting process is infallible, but we are given no reason to suppose that it is so unreliable that a jury should be forbidden to consider it. If such evidence were never admissible, molesters of small children, especially incestuous molesters, would rarely be punished. It would have been a monstrous cruelty to force T. to testify—in a public courtroom, in the presence of the father she feared—to sexual abuse by her father. Who can believe that such a confrontation would have been more likely to elicit truth than to produce sordid drama?

■ The alternative suggested by the defendant—videotaping the therapy sessions—would not have been feasible. The sessions began before Dr. McLean knew that a criminal trial would ensue, so he can hardly be faulted for not having videotaped them from the start. And surely his clients would be shocked if he had a routine practice of videotaping therapy sessions with child victims of sexual abuse. Had he begun videotaping the sessions with T. after the defendant was charged (we don't know when McLean was informed that criminal charges were pending against the defendant), the defendant would now be objecting that the videotape evidence was unreliable because the earlier sessions had not also been videotaped. Then there is the problem of editing. A videotape of all the sessions would run many hours and be unbearably diffuse and tedious, but an edited version would tend to magnify the impact of T.'s statements about sexual abuse. Finally, since a videotape cannot be cross-examined and since Nelson does not question the accuracy of McLean's testimony (as distinct from the accuracy of the statements by T. to which McLean testified), the videotape evidence would not have assisted the defense. Indeed, the defense might well have been hurt by the jury's seeing the little girl; it would have made the enormity of the defendant's crime more vivid.

Events conspired to prevent Brian Nelson from having a chance to cross-examine his principal accuser. He *was* convicted on hearsay evidence. But we should not allow labels and lawyers' pieties to delude us into believing that cross-examination of a four-year-old child concerning sexual abuse by her father a year earlier is a more effective method of discovering the truth than listening to and weighing the testimony of a competent psychologist who interviewed the child over a period of many months in a setting designed to elicit truthful communication. There is no basis for believing that T.'s testifying would have enhanced the accuracy of the jury's determination. "[A] growing number of experts argue that the testimony of child-abuse victims is more reliable if they *cannot* see the defendant," *The Supreme Court, 1987 Term: Leading Cases, supra,* 102 Harv.L. Rev. at 157 (emphasis in original; footnote omitted); for empirical support see Note, *Videotaping Children's Testimony: An Empirical View,* 85 Mich.L.Rev. 809, 814–17 (1987). There is no basis for believing that the evidence which the jury did have was insufficiently reliable to support a criminal conviction. See *United States v. St. John,* 851 F.2d 1096 (8th Cir.1988); *Morgan v. Foretich,* 846 F.2d 941, 946 (4th Cir.1988); *United States v. Cree,* 778 F.2d 474, 477–78 (8th Cir.1985); *United States v. Nick,* 604 F.2d 1199, 1204 (9th Cir.1979) —all cases upholding the admission of out-of-court statements made by child victims of sex abuse.

*Burns v. Clusen,* 798 F.2d 931 (7th Cir. 1986), on which Nelson relies heavily, does not compel a contrary result. Granted, "a witness cannot be declared 'unavailable' simply because the prosecutor or [trial] court concludes that the witness might not want to testify," *id.* at 942, and maybe that was such a case. This case cannot be so characterized. The victim in *Burns* was an adult with a fluctuating mental condition, and the only determination of her availability to testify was made two months before the trial, whereas here the trial judge's post-trial hearing determined that at the time of trial T. had been incapable of testifying without risk of serious psychological harm. Anyway T.'s unavailability was not a constitutional sine qua non of allowing her out-of-court statements to be used in evidence against her father. And how ironic it would be if the child molester could use the trauma inflicted on his victim as the fulcrum for levering his way to freedom.

The judgment of the district court is reversed with directions to deny the application for habeas corpus.

REVERSED.

FLAUM, Circuit Judge, concurring.

I concur in the judgment of the court reversing the grant of the writ of habeas corpus. I write separately to set forth my views on the appropriate method of analysis in determining whether the admission of T's statements to Dr. McLean conformed to the requirements of the Confrontation Clause. In particular, I do not agree with the majority's assertion that "T's unavailability was not a constitutional sine qua non of allowing her out of court statements to be used in evidence against her father." Rather, I believe that the Confrontation Clause required the prosecution to show that T was not available to testify at trial and that the statements themselves had particularized guarantees of trustworthiness. In my view, the prosecution has complied with both requirements. Consequently, I believe that the admission of T's statements through Dr. McLean did not violate the defendant's sixth amendment rights.

I.

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court appeared to fix both the unavailability of the declarant and the reliability of the statement as enduring lodestars in Confrontation Clause cases. In *Roberts,* a case involving testimony given at a preliminary hearing, the Court stated that generally, "the prosecution must either produce, or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant." *Id.* at 65, 100

S.Ct. at 2538. The Court, however, emphasized that a showing of unavailability is not required in all situations. *Id.* at 65 n. 7, 100 S.Ct. at 2538 n. 7.

The general language contained in *Roberts* prompted many courts to conclude that a demonstration of the declarant's unavailability was a constitutional pre-condition to the admission of most hearsay statements. *See United States v. Caputo,* 758 F.2d 944, 950 n. 2 (3rd Cir.1985) (collecting cases). The validity of this interpretation of *Roberts,* however, is suspect in view of *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). The precise holding in *Inadi* was that no unavailability showing is required when statements are admitted pursuant to Federal Rule of Evidence 801(d)(2)(E)—co-conspirator statements made during the course and in furtherance of the conspiracy. The Court justified this result on three grounds. First, the Court found that these statements derive much of their significance from the context in which they are made and that this context cannot be replicated at trial. *Id.* at 395, 106 S.Ct. at 1126–27. Second, the Court noted that the declarant will often have a motive to testify falsely about the statements in view of the specter of imminent indictment or prosecution. *Id.* Finally, the Court emphasized that the benefit to the defendant of having a co-conspirator testify is minimal and is substantially outweighed by the burden to the prosecution resulting from an unavailability requirement. *Id.* at 396–400, 106 S.Ct. at 1127–29. In the course of the opinion, however, the Court employed language that could be interpreted as repudiating the unavailability discussion in *Roberts.*

The *Inadi* decision has created an unfortunate vacuum in the Confrontation Clause realm, for at present it is not clear if a showing of unavailability is required for most types of hearsay statements. *See Mosteller, Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment,* 67 N.C.L.Rev. 257, 289 n. 9 (1989). Given its broadest construction, *Inadi* stands for the proposition that the unavailability of the declarant is a relevant constitutional factor only when the hearsay statements involve testimony given at a preliminary hearing. In my view, however, *Inadi* does not represent a repudiation of *Roberts'* unavailability discussion. Rather, I believe that *Inadi* merely reaffirms and applies the *Roberts* principle that a showing of unavailability is not required in all situations. See *Lee v. Illinois,* 476 U.S. 530, 549 n. 2, 106 S.Ct. 2056, 2067 n. 2, 90 L.Ed.2d 514 (1986) (Blackmun, J., dissenting). Thus, to me, *Inadi* represents a directive to lower courts to carefully analyze the facts of a given situation before concluding that a showing of unavailability is constitutionally required. Moreover, I believe that *Inadi* provides us with the factors to be used in making this determination—significance of the context in which the statements were made, potential change in the status of the declarant, burden to the prosecution of demonstrating unavailability and benefit to the defendant of having the declarant testify.

The delineation of these factors does not of course end the inquiry, for the question of application remains. In my view, there are two possible approaches to this problem although both lead to the same result in the present case. The first approach, which may be termed the case-by-case approach, involves analyzing the facts of a particular case in terms of the criteria delineated in *Inadi.* Under this approach, I believe that the state was constitutionally required to demonstrate T's unavailability. Unlike *Inadi,* T's statements were not made during the course of the critical event but rather represented her recollection of past events. Thus, it cannot be said that the statements derived much of their significance from the context in which they were made. Second, T's status did not change appreciably in the interval between the making of the statements and the trial —T was a little girl who was not facing the threat of prosecution and had no motive to testify falsely at trial. Third, the burden to the prosecution of producing T or demonstrating her unavailability was not substantial. T was readily identified and located and could have easily been transported to trial. Conversely, the benefit to the

defendant of having T testify at trial was substantial. T's statements went to the essential issue in the case—the identity of the abuser. Moreover, T was the only individual who had the opportunity to observe the abuser and, in fact, gave conflicting accounts of his identity. Under these circumstances, T's testimony at trial could have been critical to the defendant for if T repudiated her identification of the defendant on the stand, in all probability a judgment of acquittal would have been entered.

The case-by-case approach is appealing in the abstract, for in theory, it should accurately identify the cases where a showing of unavailability would be pointless. On further reflection, however, significant problems with this approach emerge. In particular, I believe that a case-by-case approach will engender a great deal of uncertainty in a critical area of the law. Thus, neither party will know prior to trial whether a showing of unavailability will be required. Consequently, the prosecution may in fact expend a great deal of effort in order to produce a declarant only to discover that the presence of the declarant at trial was not required. Moreover, it will often not be possible for the trial judge to accurately evaluate the *Inadi* factors at the time the prosecution offers the statements. In particular, the benefit to the defendant of the declarant's testimony may not become apparent until other witnesses testify.

A second possible approach would link the unavailability requirement to the particular hearsay exception. Under this approach, a determination that a statement fits within the medical diagnosis exception will necessarily dictate a particular result on the unavailability issue. By its terms, this approach demands assumptions about the nature of evidence admitted under the particular exception in criminal cases and the identity of the typical declarant. These assumptions in turn are to be evaluated in light of the criteria delineated in *Inadi*. As with all generalizations, there is always the possibility of an erroneous result in a particular case. In my view, however, the danger of erroneous results when this exception is involved is slight and is substantially outweighed by the certainty that this approach would provide. The need for certainty, a primary goal of Confrontation Clause jurisprudence, *see Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), is particularly acute in the case of this particular exception for the medical diagnosis exception is being used with increasing frequency in prosecutions for child abuse. *See United States v. Shaw*, 824 F.2d 601 (8th Cir.1987); *United States v. Renville*, 779 F.2d 430 (8th Cir. 1985); *United States v. Iron Shell*, 633 F.2d 77 (8th Cir.1980); *United States v. Nick*, 604 F.2d 1199 (9th Cir.1979).

As noted above, the Supreme Court in *Inadi* identified several factors in determining that the prosecution need not demonstrate the declarant's unavailability when statements fall under 801(d)(2)(E)—significance of the context in which the statements were made, potential change in the status of the declarant, burden to the prosecution of producing the declarant, and minimal benefit to the defendant of having the declarant testify. In my view, these factors are inapposite to the typical case involving Rule 803(4) or its state counterpart. Consequently, I would hold that when statements are admitted pursuant to the medical diagnosis exception to the hearsay rule, a showing of unavailability is always required.

First, I do not believe that statements ordinarily admitted under the medical diagnosis exception derive much significance from the context in which they are made. Unlike the co-conspirator context, the declarant under the medical diagnosis exception is not engaged in an illicit enterprise at the time the statements were made; in fact as in this case, the statements are generally not made when the relevant act is taking place but rather represent the declarant's recollection of past events. In this respect, the statements are akin to trial testimony. Thus, I believe that "when the declarant takes the stand, his in-court testimony [generally] will reproduce a significant portion of the evidentiary value of the statements." *Inadi*, 475 U.S. at 395, 106 S.Ct. at 1126.

Second, unlike *Inadi*, the status of the typical declarant under this particular exception will not have changed materially between the time the statements were made and the time of trial. The declarant under this exception will generally be a victim not a criminal facing the threat of imminent prosecution, and will usually have no motive to testify falsely about his or her prior statements.

Finally, in my view, the outcome of *Inadi's* balancing test is reversed when the medical diagnosis exception is involved. In *Inadi*, the Court emphasized the burden to the entire criminal justice system of adding another tier of appellate review in complex cases and the burden to the prosecution of identifying, locating and transporting the declarant to trial. These conclusions are premised on the special nature of conspiracies which often involve several individuals scattered throughout a wide area. These factors, however, are not present under the medical diagnosis exception. In a typical case under this exception there is a single declarant,—the victim, who is easily identified and located.

On the other hand, the value of the testimony by a declarant under this exception is generally substantial. As noted above, the typical declarant under this exception is the victim, and generally is the only individual with first-hand knowledge of the crime. Moreover, the statements themselves generally involve central issues in the case such as identity, *United States v. Renville*, 779 F.2d 430, 437 (8th Cir.1985), cause, *United States v. Nick*, 604 F.2d 1199, 1201–02 (9th Cir.1979) or fact of injury. Given these facts, in most cases the appearance of the typical declarant under the medical diagnosis exception is of great value to the defendant for by discrediting the declarant's testimony, the defendant necessarily casts doubt upon the principal evidence in favor of the prosecution.

Thus, under either a case by case or exception by exception approach, I believe that the Confrontation Clause required the prosecution to demonstrate T's unavailability as a condition to the admission of the statements through Dr. McLean. Having

said this, I nevertheless conclude that the prosecution has succeeded in demonstrating that T was unavailable. I do not reach this conclusion due to T's age. While the fact that T was three years old at the time of trial is certainly a relevant factor in determining unavailability, it is not in my view dispositive since extremely bright, verbal three year olds can provide meaningful testimony at trial. *See e.g., United States v. Frazier*, 678 F.Supp. 499 (E.D.Pa. 1986). Rather, I believe that the prosecution clearly established that T could not provide meaningful testimony about the alleged assault. The testimony of Dr. McLean, the only professional who had significant contact with T, indicated that the victim, even on the eve of trial strongly resisted making any statements about her father. Moreover, the defendant introduced no evidence that even obliquely questioned the validity of this assertion. Given these facts, I believe that the prosecution established that T was not available to testify at trial.

## II.

In addition to establishing T's unavailability the prosecution also had to demonstrate that the statements had sufficient indicia of reliability. In *Roberts*, the Court held that the reliability requirement could be satisfied in two ways. First, "reliability could be inferred without more when the evidence fell within a firmly rooted hearsay exception." 448 U.S. at 66, 100 S.Ct. at 2540. Second, even if the evidence did not come within a firmly-rooted exception, reliability could be shown if the evidence had particularized guarantees of trustworthiness." *Id.*

In *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the Supreme Court elucidated the meaning of the term "firmly-rooted." There, the Court held that a firmly-rooted hearsay exception is one that has "a long tradition of being outside the compass of the general hearsay exclusion." *Id.* 107 S.Ct. at 2783. Thus, the test of "firmly-rooted" is simply the longevity of the exception's existence. The Court noted, however, that when the

evidentiary rule deviates from the common law approach an independent reliability inquiry is required. *Id.*

The Wisconsin Supreme Court held that T's statements identifying the defendant as the abuser fit within the medical diagnosis or treatment exception to the hearsay rule and the validity of this interpretation is not an issue in this habeas corpus case. At common law, the admission into evidence of statements made to others for purposes of treatment was a well-established practice. *See United States v. Nickle,* 60 F.2d 372, 373–74 (8th Cir.1932). The common law version of this exception, however, did not embrace statements of fault; the admission of these types of statements under this particular exception is the product of the Federal Rules of Evidence (enacted in 1974) and recent court decisions. *See People v. LaLone,* 432 Mich. 103, 437 N.W.2d 611 (1989). Since this development represents a marked deviation from and expansion of the common law approach, *Bourjaily* dictates that an individualized examination into the reliability of T's statements is required.

As noted above, under the second *Roberts* test statements are admissible if they have particularized guarantees of trustworthiness. In my view these guarantees are present in this case. First, as the majority notes, the graphic description of the nature of the abuse in childlike language clearly established that sexual abuse had taken place. Second, T told several other individuals who testified at trial that the defendant had abused her. Finally, shortly after the alleged acts had taken place, T began manifesting an abnormal and uncharacteristic terror at the prospect of seeing her father. Given these facts, I believe that T's statements to Dr. McLean identifying the defendant as the abuser had particularized guarantees of trustworthiness within the meaning of *Roberts.*

In sum, I believe that the prosecution was required to show that T was not available to testify at trial and that the statements she made to Dr. McLean had particularized guarantees of trustworthiness. In my view, the prosecution satisfied both of these requirements. Consequently, I agree with the majority that the admission of T's statements to Dr. McLean at trial did not violate the defendant's sixth amendment rights.