St. Luke GREGORY, Jr.,
Petitioner–Appellee,

v.

STATE OF NORTH CAROLINA; Attorney General of North Carolina, Respondents–Appellants.

No. 89–7514.

United States Court of Appeals, Fourth Circuit.

Argued July 12, 1989.

Decided April 4, 1990.

Richard Norwood League, Sp. Deputy Atty. Gen. (argued), Lacy H. Thornburg, Atty. Gen., on brief, Raleigh, N.C., for appellants.

James Riley Parish, Parish, Cooke & Russ, Fayetteville, N.C., for appellee.

Before ERVIN, Chief Judge, and PHILLIPS and WILKINSON, Circuit Judges.

ERVIN, Chief Judge:

St. Luke Gregory, imprisoned by North Carolina for taking sexual advantage of his young daughter, brought this Section 2254 case challenging the admission of two hearsay statements identifying him as the assailant. Gregory argues that the statements were so untrustworthy as to have violated his Sixth Amendment right to confront his accuser. The district court agreed that statements the child made several months before the crimes occurred were too unreliable to support the conviction, and ordered relief in the form of a new trial. We affirm.

I.

A jury concluded that Gregory had sexually assaulted his daughter LaTonya, then three-and-a-half years old, in September, 1984. Some of the most damning evidence against Gregory came in testimony from LaTonya's maternal grandmother, Doris Griffin, who often babysat the child while Gregory and his wife, LaTonya's mother, worked.[1]

In June, 1984, and again on September 7, 1984, Gregory dropped LaTonya off at Griffin's home and proceeded to work. During both visits, LaTonya exclaimed something like "Daddy put it in my butt", a remark the parties agree connotes a sexual

---

1. LaTonya did not testify. N.C. Superior Court Judge Small presided over Gregory's trial and the *voir dire* hearing on Gregory's motion to suppress LaTonya's testimony. The judge observed that LaTonya, while brighter than average, could not intelligibly express what had happened, and could not appreciate her obligation to tell the truth. Though physically available and, apparently, present for at least some of the trial, LaTonya was declared an incompetent witness, leaving hearsay the only route by which her story could come before the jury.

contact between father and daughter.[2]

The September remark finds corroboration in Griffin's discovery of a substance, apparently pus, on LaTonya's panties and testimony that LaTonya would not allow her to touch her crotch because it hurt. Dr. Phillip Greene, who examined LaTonya later that day, testified that "[LaTonya] said that her daddy unzipped his pants and "told me do my legs apart," and she showed me by the spreading of her legs, and he—those are my words. These are her words: "Wanted to get close to me," and the fourth part of this continuous sentence was that "that he hurt me here," and she pointed to between her legs." [3]

**2.** What Griffin reports LaTonya to have said in June was "Grandmama, my daddy pooted in my butt." We believe, and the parties impliedly agree, that this statement imported to the jury the same message as the less ambiguous September remark "Daddy put it in my butt."

Griffin's testimony follows verbatim. After describing her discovery of what looked like pus between LaTonya's legs on September 7, the exchange between Griffin and the prosecutor was as follows:
Q: First, did she [i.e. LaTonya] tell you something?
A: Yeah. She told me her daddy put it in her butt.
* * * * * *
Q: Okay. And did she point or anything like that at that time?
A: Yeah. She pointed down there.
Q: All right. Where did she point to?
A: In front. Below.
A: Okay. After she said that "My daddy put it in my—" Were those her words, "My daddy put it in my butt?"
A: Yes.
Griffin subsequently related what passed between her and LaTonya several months earlier.
Q: Okay. How long—how much time was it before the September 7th incident?
A: About three months.
* * * * * *
Q: Where was it that [LaTonya] spoke to you?
A: In the house. As you enter the house.
Q: About what time was it?
A: About six or a little after six.
Q: In the early morning?
A: Yes.
Q: And how had she gotten to your house?
A: I think her father brought her.
Q: Okay. And what was she doing at your house?
A: I kept her days.
Q: You were babysitting then?
A: Yes.

No contemporaneous evidence corroborates LaTonya's June statement. Griffin noticed nothing in LaTonya's appearance or conduct that triggered suspicion, and seems to have dismissed the remark as a naive impertinence.

A Dr. Beals testified that on September 13, 1982, he had diagnosed gonorrhea in the seventeen-month-old LaTonya. Beals observed that sexual congress is the means of transmitting gonorrhea "almost in every case known", and that the probability of infection by other means is very slight. Other evidence indicated that Gregory had been treated for gonorrhea at about the same time.[4]

Q: And what, if anything,—okay. How long had she been in the house when she spoke to you?
A: She just spoke and then she told me that.
Q: Okay. What was the first thing she said to you?
* * * * * *
A: The first thing she said to me, she said, "Grandmama, my daddy pooted in my butt."
Q: And what did you say to her?
A: I told her, "Shut up." I would tell her mother when she came in from work.
* * * * * *
Q: Okay. From that day up until September the 7th, 1984, at any time did she ever discuss the—did you ever discuss the matter with LaTonya again?
A: No,—no.

**3.** The trial court allowed Greene to relate LaTonya's statements under N.C. R.Evid. 803(4), which allows for the admission of hearsay statements given for purposes of medical diagnosis. The North Carolina Court of Appeals, in its decision reversing Gregory's conviction in part, affirmed the application of 803(4) to Greene's testimony, and held the provision applicable as well to Griffin's hearsay testimony about what LaTonya told her on September 7. *State v. Gregory*, 78 N.C.App. 565, 338 S.E.2d 110 (1985).

The Court of Appeals also suggested that Griffin's hearsay testimony about LaTonya's June statements, admitted under the excited utterance exception of N.C.R.Evid. 803(2), might have come in under 803(4) as well. Holding the hearsay at worst harmless error, the court found it unnecessary to speak firmly to the admissibility of the September 7 hearsay. The court similarly held the admission of the gonorrhea test results no more than harmless error.

**4.** The trial court admitted proof of LaTonya's and Gregory's treatment for gonorrhea under N.C.R.Evid. 404(b), as evidence of a prior bad

The district court accepted the magistrate's recommendation that it rule the June hearsay inadmissible, finding "absolutely no objective corroborative evidence of the abuse reported at that time." The court viewed LaTonya's September statements to Griffin and Greene in a different light, rejecting the magistrate's counsel that it hold these two inadmissible also. Identifying a dozen factors corroborating the September statements, the district court concluded that while it "is on the cutting edge of the issue of relaxation of confrontation clause requirements", the indicia of reliability associated with the statements warranted admission.[5]

## II.

The issue for our review is one arising with depressing frequency in our nation's courts, one that, as a sister Circuit has observed, "place[s] a strain on traditional notions of procedural justice." *Nelson v. Farrey*, 874 F.2d 1222, 1224 (7th Cir.1989), cert. denied, — U.S. ——, 110 S.Ct. 835, 107 L.Ed.2d 831 (1990) (citations omitted). The victim and principal witness to the crime charged is, by virtue of the youth that made her so vulnerable, unable to give reliable testimony. Her absence deprives the accused of the opportunity to cross-examine his accuser, an opportunity that, though some aver it a poor way to elicit truth from a very young child, our system

holds dear. *Id.* at 1230; *The Supreme Court, 1987 Term: Leading Cases*, 102 Harv.L.Rev. 143, 157 (1988).

In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court promulgated a rule mediating between the accused's interest in confrontation, [and broadly in the best exposition of the truth,] and the victim's and society's interest in the effective prosecution of child abuse. The rule allows the admission of hearsay evidence from an unavailable declarant if, though not within any well-recognized exception to hearsay exclusion, the evidence bears "particularized guarantees of trustworthiness."[6] *Id.* at 66, 100 S.Ct. at 2539. It is the district court's *Roberts* analysis that we review today.

In this case, the issue is whether we may look a considerable distance backward and forward from June of 1984—principally to the 1982 diagnosis of gonorrhea and the events of September of 1984—for corroborating factors. This issue is novel to us. The district court, referring to a portion of the magistrate's decision citing cases from two other courts of appeals, stated that it would address the statements' reliability in light of contemporaneous circumstances. *See United States v. Renville*, 779 F.2d 430, 440 (8th Cir.1985) ("[T]he reliability of the declaration is assessed in light of the circumstances at the time of the declara-

---

act showing identity. Griffin testified that she had seen the pus-like substance she discovered on September 7 once before, when LaTonya was seventeen months old, but did not state to the jury that the earlier observation signaled gonorrhea.

**5.** Gregory has not cross-appealed from the portion of the district court's order condoning admission of the September hearsay through the testimony of Griffin and Greene. Our analysis accordingly treats only the admissibility of the June hearsay.

**6.** The threshold test for admissibility under *Roberts* is whether the hearsay declarant is "unavailable" to testify. 448 U.S. at 66, 100 S.Ct. at 2539. *Roberts* left unclear whether the unavailability requirement applies with equal force in all cases, suggesting as it did the option of compressing its two-part test into a single inquiry into reliability when the utility of confrontation is shown to be remote, as when the declarant is

too immature for meaningful cross-examination. 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7 (citing *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)); *see also United States v. Inadi*, 475 U.S. 387, 396, 106 S.Ct. 1121, 1126, 89 L.Ed.2d 390 (1986).

We have, like other circuits, as a general matter held child abuse victims found incompetent to be "unavailable" under *Roberts*. *Ellison v. Sachs*, 769 F.2d 955, 957 n. 4 (4th Cir.1985); *see also United States v. Dorian*, 803 F.2d 1439, 1446–47 (8th Cir.1986); *Haggins v. Warden*, 715 F.2d 1050, 1055 (6th Cir.1983); *United States v. Iron Shell*, 633 F.2d 77, 87 (8th Cir.1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); *United States v. Nick*, 604 F.2d 1199, 1202 (9th Cir.1979). We agree with the district court that LaTonya, incompetent due to immaturity, was "unavailable" and pass to the knottier question of whether her June statement bore sufficient indicia of reliability to have comported with Gregory's Sixth Amendment right to confront her.

tion and the credibility of the declarant.") (citing *Huff v. White Motor Corp.*, 609 F.2d 286, 292 (7th Cir.1979)); *see also United States v. Dorian*, 803 F.2d 1439, 1444 (8th Cir.1986) (quoting the *Renville* contemporaneity requirement); *United States v. Love*, 592 F.2d 1022, 1027 (8th Cir.1979). As we shall explain, even if we disagreed with the well-reasoned requirement of contemporaneous corroboration, a requirement implicit in the *Roberts* insistence on "particularized" guarantees of reliability, we nonetheless would hold the chronologically distant evidence presented in this case to be a logically insufficient index of the reliability of the June hearsay.

No doubt because of the relative novelty of the *Roberts* exception and the fact-specific examination each *Roberts* inquiry demands, the cases, rather than publishing a comprehensive list of possible corroborating factors, tend to consider what, in the declarant's condition or otherwise, suggests truthfulness or a lack thereof. For example, in *Ellison*, the district court referred to the many discrepancies among the five-year-old sexual assault victim's descriptions of her assailant and the place of her assault in concluding that admission of the descriptions as hearsay violated the accused's Sixth Amendment rights. *Ellison v. Sachs*, 583 F.Supp. 1241, 1249 (D.Md.1984), *aff'd*, 769 F.2d 955, 957 (4th Cir.1985) ("[A]s the district court documented in careful detail, there are serious discrepancies which indicate that the victim's out-of-court statements and identification of Ellison were not at all reliable.")

In *Morgan v. Foretich*, 846 F.2d 941 (4th Cir.1988), one issue before the panel was whether the district court had abused its discretion in ruling five statements made by a young girl to her mother, all suggesting sexual abuse by the girl's father, inad-

missible under the excited utterance exception to the hearsay exclusion.[7] Fed.R.Evid. 803(2). We noted "substantial physical evidence and doctors' testimony" corroborating the girl's tales of sexual assaults, which she described in childish terms but with an "extensive knowledge of sexual activities," both characteristics belying an attempt at fabrication. 846 F.2d at 948. The girl's near-hysterical condition left "little doubt ... that she was acting under the stress of the situation." *Id.*

We find it impossible to weave the factors influential in *Ellison* and *Morgan*, or the principles informing the factors, into a justification for the admission of the June hearsay. As we have said, there is no corroborating evidence peculiar to the June statement. The September developments alone cannot bootstrap the earlier statement into a category of reliable hearsay. It is a considerable leap from the varied evidence that Gregory sexually abused La-Tonya in September to the conclusion that LaTonya's tantalizing hint of an earlier assault must also be true. In this case, at least, where the trial court ruled the declarant incompetent because of her proclivity to "make up things," including things about her father, and inability to appreciate the need for truthfulness, we are unable to see how the corroborated September statement relates favorably enough to the truthfulness of the June statement to overcome the complete absence of contemporaneous corroboration for the latter. *See Dorian*, 803 F.2d at 1444 (emphasizing the declarant's credibility as a factor in evaluating reliability); *Renville*, 779 F.2d at 440 (same).

We consider first the substance of the statement itself, then consider whether evidence extrinsic to the statement reflects favorably on its truth.[8] Without making

---

7. *Morgan* arose as an appeal from a jury verdict for the defendants in a suit by mother and daughter against the father and his parents for damages arising from the alleged sexual abuse. The contested evidentiary rulings having run in defendants' favor, the panel had no occasion to address an argument that admitted hearsay contravened the *Roberts* minima for reliability. *Morgan* discusses "factors of trustworthiness" in

its 803(2) analysis, however, and so is instructive in our analysis.

8. As we have said, there is no contemporaneous corroboration for the June statement in the usual sense, that is in evidence other than the statement itself. Most courts examining such cases, however, include within the definition of corroborating evidence characteristics of the statement making it more likely reported fact

light of what certainly happened to LaTonya in September, we can imagine a very young child, particularly one so bright, blithely making a sexually charged reference based on something she encountered on television or elsewhere.[9] The reference might improperly describe an innocent contact by the father. Not a detailed account of an event ordinarily beyond a child's experience, LaTonya's remark is less credible *per se* than the tales of abuse recounted in *Ellison* and *Morgan*. *Cf. Ellison*, 769 F.2d at 957 ("[S]everal courts and commentators have observed that a young child's description of a sexual assault may, in particular circumstances, contain its own inherent verity.") (citations omitted). The June remark did not indicate when the contact had occurred, leaving unclear whether Gregory might have had the opportunity to commit the assault.

At least as troubling as the problematic significance of the June remark *in se* is the lack of any extrinsic evidence indicating LaTonya had undergone a recent sexual assault. LaTonya made her remark only minutes after Gregory left, when the excitement and fear induced by her assailant's presence would likely persist. Griffin, however, familiar as she was with LaTonya's personality and solicitous, as we infer, of her welfare, read nothing in her manner to lend credence to the remark.[10]

Reflection on the corroborative value of the 1982 diagnosis of gonorrhea reveals many of the problems we associate with corroboration by the September evidence. The conclusions we must make to link the diagnosis and the June statement are these: the diagnosis implies a sexual con-

tact between Gregory and LaTonya, and the statement reflects either that contact or one closer in time to June, 1984. We will assume the truth of the first and consider in turn the reliability of the second and third conclusions.[11]

We cannot confidently conclude that an instance of abuse in 1982 inspired the June statement. We must resist the temptation to decide that, because we would likely find the diagnosis sufficient corroboration for the remark if they had occurred at about the same time, the two years intervening between the events is insignificant. On the contrary, the time is likely more significant in the context of a very young declarant. We are not sure, and the record holds no evidence, that LaTonya would have remembered a sexual incident occurring at seventeen months, at least in the terms she used in the June statement. LaTonya could not have made the statement under the excitement of the two-year-old incident, at least not in any sense of excitement yet recognized under 803(2). Absent any evidence why LaTonya would have kept quiet about the incident for so long, or by contrast why she would have chosen June, 1984, to speak of it, the time between diagnosis and statement gives ample reason to doubt a causal relationship.

The circularity of the second conclusion, that the remark suggests a pattern of abuse, is clear. While we assume sexual abuse in 1982, and are confident of abuse in September, 1984, only by assuming as well what we are charged with deciding— that the June, 1984, remark reveals a third incident—may we conclude that the remark

---

than fiction. *See, e.g. Nick*, 604 F.2d at 1204 (certain statements of an alleged child abuse victim may have "the ring of verity").

**9.** Several sources have noted the unfortunate irony that increased education about child sexual abuse may increase the number of false alarms raised by children who mistake innocent contacts or overtures for malignant advances. *See* Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two Legislative Innovations*, 98 Harv.L.Rev. 806, 820 & n. 94 (1985).

**10.** Griffin testified that her daily routine when tending LaTonya included bathing the child.

Unlike her account of LaTonya's state on September 7, Griffin did not testify to having observed anything in the child's physical condition suggesting recent sexual abuse.

**11.** That the 1982 diagnoses reveal a sexual contact between Gregory and LaTonya is by no means a settled fact, although the conclusion seems indispensable to use of the diagnoses as corroboration for the June remark. Also, this evidence of gonorrhea in 1982, which is stressed in the dissent, loses much of its impact when it is recalled that Gideon Griffin, LaTonya's uncle who lived across the street, was also diagnosed as having gonorrhea on August 19, 1982.

is reliable in indicating a pattern corroborated by the evidence of a 1982 contact. The remark is, on the evidence, as consistent with two discrete incidents as with a pattern of which these corroborated incidents are but a part. Without some evidence suggesting abuse between 1982 and September, 1984, then, there is no sound basis to extrapolate an intervening incident. This tautology, and the temptation to ignore it, confident that a young child would not suggest sexual abuse if it had not occurred, point up the wisdom of a rule requiring at least some contemporaneous corroboration.

### III.

We now consider whether admission of the June hearsay was harmless beyond a reasonable doubt.[12] The district court agreed with the magistrate's conclusion that the error was not harmless, "inasmuch as [LaTonya's] identification of [Gregory] was the sole source of identification as to the perpetrator of the crime" and notwithstanding its decision that the September hearsay was admissible.

We similarly believe that the jury might well have taken LaTonya's June statement, phrased so similarly to her September exclamation to Griffin, as sound corroboration for LaTonya's September identification of Gregory as her assailant. Without the June statement, and with some benign means of contracting gonorrhea a possibility, the jury might have had less confidence in LaTonya's identification.[13] Uncertain whether the June hearsay was significant to the jury, we must hold admission of the

hearsay harmful error warranting *habeas* relief.[14]

### III.

For the reasons presented in the preceding sections, we affirm the district court's decision finding a violation of Gregory's rights under the Confrontation Clause and ordering relief in the form of a new trial.

AFFIRMED.

WILKINSON, Circuit Judge, dissenting:

The majority holds that St. Luke Gregory's conviction for taking sexual advantage of his daughter must be overturned because one of two virtually identical hearsay statements identifying him as the assailant was, in its view, erroneously admitted into evidence. At bottom, the majority doubts the reliability of a jury verdict in a case where a father and his three-year-old daughter had simultaneously been diagnosed with gonorrhea, a sexually transmitted disease. If this verdict is unreliable, then I fear reliability in prosecutions for the sexual abuse of very young children is beyond our grasp. Because the evidence supports this conviction beyond any reasonable doubt, I would hold any error in the admission of the statement harmless and reverse the grant of habeas corpus by the district court.

The pervasive error the majority commits is plain. It will not permit the 1982 diagnosis of gonorrhea to support the admission of the June 1984 hearsay statement because the diagnosis and the statement were not "contemporaneous." It holds that, un-

---

**12.** *Coy v. Iowa,* 487 U.S. 1012, 1021, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857, 867 (1988) makes plain that the harmless error standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) applies in cases revealing violations of the Confrontation Clause.

**13.** The doubts about LaTonya's credibility that led to the incompetency ruling are apposite to this as well as the Sixth Amendment portion of our analysis. Although the jury was not aware of the information in the same fashion, we have in mind also LaTonya's testimony at the *voir dire* hearing that it was fun to make things up, including things about her father, that she

would tell things that did not happen, and that her mother and grandmother had told her what to say at the hearing.

**14.** In addition to our conviction that this is not a "harmless error" case, we are unwilling to use this analysis where the State does not rely upon it. Despite the North Carolina Court of Appeal's lead, the State did not argue it to the district court, nor present it in its briefs or argument to us. On the contrary, the State's representative, during oral argument, declared "I did not argue harmless error," and declined to adopt it on appeal despite several opportunities to do so.

der *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), the "particularized guarantees of trustworthiness" for hearsay statements must be contemporaneous as well. The *Roberts* Court did not embrace that narrow view, and I dissent from its adoption by the majority. Under the majority's analysis, no evidence of prior sexual abuse could support the trustworthiness of a child's later statement. The Eighth Circuit took a contrary position in *United States v. Dorian*, 803 F.2d 1439, 1444–47 (1986), and I agree with its reasoning.

### I.

At issue here are two statements made by three-year-old LaTonya in June, 1984 and on September 7, 1984 as reported by her grandmother, Doris Griffin. One morning in June, immediately after her father dropped her off at Griffin's house, LaTonya stated, "My daddy pooted in my butt." Her grandmother told the child to "Shut up," and notified LaTonya's mother of the statement. Similarly, on September 7, again after her father had delivered her to Griffin's house, LaTonya stated, "My daddy put it in my butt." On that occasion, LaTonya also was found by her grandmother to have a thick, white discharge between her legs and she complained of pain in her genital area. The physician who examined LaTonya that afternoon in connection with these complaints found the presence of redness, irritation and pus-like discharge in her vaginal area. He diagnosed the condition as vaginitis, which he testified "fully supported" the child's statements describing sexual abuse. The district court held that the September statement was reliable.

This case is paradigmatic of situations where there may have been repeated instances of child abuse and the child may well have made statements about a number of them. *See, e.g., Morgan v. Foretich*, 846 F.2d 941, 945–46 (4th Cir.1988). The majority bases its decision, in part, on the view that LaTonya was too young to give reliable testimony, but if that were the end of the matter, the protection offered by law to these most vulnerable of beings would be scant. In this case, both statements were more supportable than the majority believes, and any error in the admission of the June statement was clearly harmless.

### II.

The harmlessness of any error here should be apparent. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). The June statement was unimportant in light of the state's otherwise strong case against Gregory. *See United States v. Crockett*, 813 F.2d 1310, 1315–16 (4th Cir.1987). Gregory was not convicted in connection with any events surrounding the June statement. The September statement already identified Gregory and implicated him as the perpetrator of the September 7 crimes for which he was found guilty. The majority expresses concern that the jury may have taken the June statement as "sound corroboration" for LaTonya's identification of her father in the September statement. However, the September statement was soundly corroborated by no less than twelve separate factors enumerated by the district court. I summarize them briefly here: (1) LaTonya was in the physical custody of her father immediately before the September 7 statement was made; (2) Prior to arriving at her grandmother's house at 6:05 A.M. on September 7, LaTonya would have been at home in bed, a fact compatible with the child's statement that her father molested her in bed while her mother was asleep; (3) LaTonya's grandmother inferred that sexual abuse had occurred because she found an undried substance on the child's underpants which subsequent medical tests determined to be the result of vaginitis; (4) A medical examination of LaTonya on the afternoon of September 7 revealed inflammation and irritation of the child's vagina and was consistent with LaTonya's statement; (5) LaTonya had made a similar statement in June 1984; (6) In 1982, LaTonya and her father simultaneously had been diagnosed with gonorrhea, a sexually

transmitted disease;[1] (7) LaTonya's statements to the doctor outside of the presence of her grandmother that her daddy had "unzipped his pants" and "told me do my legs apart" and "hurt me here [pointing to between her legs]" corroborated the statement; (8) LaTonya would be motivated to be truthful in her statements to the doctor because she perceived him as trying to help her; (9) LaTonya's version of the events had no internal inconsistencies; (10) A child of age three would be unlikely to spin a fabrication out of self-interest; (11) There is no evidence to suggest that LaTonya was influenced or coerced to identify her father as the perpetrator of sexual abuse; (12) Since LaTonya was within the parental control of her father and her negative statements could have made him angry, they could be regarded as statements against her personal interest.

The June statement was at most cumulative of the September statement and the "other overwhelming and largely uncontroverted evidence properly before the jury." *Brown v. United States*, 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973). The June and September statements were virtually identical except for the substitution of the words "pooted in" for "put it in," and the implication of sexual molestation implicit in each is essentially the same. The June statement did not contradict either the later statement or any other evidence offered in the case. At most it tended to corroborate other, more detailed and admissible evidence. *See Schneble v. Flor-*

*ida,* 405 U.S. 427, 431, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972).

It was clear to the North Carolina Court of Appeals that any error here was non-prejudicial. *See North Carolina v. Gregory*, 78 N.C.App. 565, 338 S.E.2d 110, 113 (1985) ("in the light of all the circumstances of this case, the admission of the statement is at worst non-prejudicial error"). Why the majority rejects this conclusion is beyond me.[2] Neither protection of the innocent nor respect for the criminal process is furthered by focusing on the "virtually inevitable presence of immaterial error" rather than upon "the underlying fairness of the trial." *Van Arsdall*, 475 U.S. at 681, 106 S.Ct. at 1436. The jury believed this child was sexually molested by her father, and the majority offers no basis for disbelief. Retrials, which may be less contemporaneous, more rehearsed, and less reliable, should be reserved for situations where it is clear that "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *Schneble*, 405 U.S. at 432, 92 S.Ct. at 1059.

### III.

The majority also refuses to consider the 1982 diagnosis of gonorrhea as part of the totality of circumstances that support the trustworthiness of LaTonya's June statement. The majority apparently concludes that only "contemporaneous" circumstances may be considered as "particularized guarantees of trustworthiness" under *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Neither the

---

**1.** The majority suggests that the diagnosis does not necessarily imply a sexual contact between LaTonya and her father, noting the fact that LaTonya's uncle, Gideon Griffin, also tested positive for gonorrhea in 1982. However, there is no evidence in the record that Gideon Griffin was ever implicated by LaTonya or anyone else as having had sexual contact with her or that he ever had sole physical custody of the child. At Gregory's trial the parties stipulated to the fact of Gideon Griffin's 1982 diagnosis, but no exculpatory use was ever made of it, and the district court noted but attached no significance to it in its own analysis. I fail to see why the simultaneous diagnosis of gonorrhea in LaTonya and her father is somehow less significant or trustworthy because another individual, against whom no evidence has ever been offered, con-

tracted a venereal disease. Indeed, Gregory himself makes no such argument in his brief on appeal.

**2.** The majority is properly worried about resting its analysis of the harmless error point solely on the grounds of waiver. This court has, for obvious reasons, always been cautious about saddling parties with "concessions" made at oral argument. The appellee vigorously argued the issue of harmless error in its brief, presumably to counter the government's presentation of the case against Gregory apart from the June statement. Addressing the harmless error question directly is preferable to finding a concession at argument which frankly seems at odds with much of the government's position in its brief.

language in *Ohio v. Roberts*, nor the analogous language of Fed.R.Evid. 803(24) and 804(b)(5), nor the cases cited by the majority construing these rules refer to any contemporaneity requirement. Even if I agreed with the majority's conclusion that only contemporaneous circumstances may be considered under the above hearsay exceptions, the Confrontation Clause, which governs here, is not merely a "codification of the rules of hearsay," *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970), and *Ohio v. Roberts* makes no reference to the temporality of the required "particularized guarantees of trustworthiness."

Confrontation Clause analysis has always required an evaluation of each case on its facts rather than the application of a mechanical test. *Barker v. Morris*, 761 F.2d 1396, 1400 (9th Cir.1985). The test is "whether the factors surrounding the making of the out-of-court statement, taken as a whole, indicate trustworthiness." *Id.* at 1403. Contemporaneous corroboration is one, but only one, such factor. For example, in *United States v. Dorian*, 803 F.2d 1439, 1444–47 (8th Cir.1986), the court considered, under both Fed.R.Evid. 803(24) and *Ohio v. Roberts*, the trustworthiness of hearsay statements made by a five-year-old sexual abuse victim nearly one month after the alleged abuse could have occurred. The court concluded that the statement was trustworthy under both the Federal Rules and the Confrontation Clause based upon evidence spanning the period between the abuse and the statement, including the child's behavior on various occasions, statements made by her mother, inculpatory actions by the defendant, and medical evidence obtained five days after the alleged abuse and three weeks before the statement. Under the majority's analysis, it is doubtful that any of these non-contemporaneous factors could have been considered. *See also Nelson v. Farrey*, 874 F.2d 1222, 1234 (7th Cir.1989) (Flaum, J., concurring) (particularized guarantees of trustworthiness included child's behavior at the prospect of seeing her allegedly abusive father approximately three to eleven months before the hearsay statements were made).

To be sure, circumstantial guarantees of trustworthiness will often be contemporaneous. However, circumstantial evidence as a category includes many kinds of indirect evidence—both contemporaneous and non-contemporaneous—from which to evaluate the reliability of a statement. The importance of recognizing non-contemporaneous factors may be particularly great in child abuse prosecutions because "significant delays in reporting this abuse may occur because of confusion, guilt, and fear on the part of the child." *Morgan*, 846 F.2d at 947. *See Dorian*, 803 F.2d at 1444 ("it frequently takes a long time for children to share what is really going on and they may then do so in stages, telling a little more each time").

Courts should ask simply whether a circumstantial guarantee of trustworthiness is a strong one, not whether it does or does not fit into some judge-made category of "contemporaneity." Appellate judges buy nothing but trouble when they attempt to prescribe evidentiary litmus tests as a substitute for the reliability determinations of the presiding judge at trial. The drafters of the Federal Rules of Evidence and the Supreme Court majority in *Ohio v. Roberts* avoided this pitfall, and I am sorry to see the majority slip into it. The majority's position will inevitably lead to uncertainty as to how close in time to the statement a guarantee of trustworthiness must be to qualify as a contemporaneous one.

The artificiality of the majority's focus on contemporaneity is amply illustrated by its discussion of the June statement. The trustworthiness of LaTonya's earlier statement is not merely a matter of "bootstrapping" it by the September events into a category of reliability, as the majority claims. Nor is her statement the likely product of a childish fantasy or some televised depiction. No fewer than seven out of the twelve factors which the district court found to be sound corroboration for the September statement apply equally to the June statement, including the earlier "non-contemporaneous" diagnosis of gonorrhea. The majority presumably holds this diagnosis to be irrelevant because it

occurred in 1982, but I would consider it, albeit cautiously, as evidence of trustworthiness because the subject of the simultaneous diagnosis is the very same person about whom LaTonya later voiced her complaint and because there was no explanation, other than sexual contact with her father, offered for this child's venereal infection. Given the well-corroborated September statement and the circumstantial evidence that does support the trustworthiness of the June statement, any error in its admission was of the most marginal sort.

## IV.

The majority expresses an interest in "contemporaneity" as a guarantor of reliability, but the irony of its position apparently escapes it. The result of its holding is the need for a retrial, if the witnesses can be located and remain in health (if witnesses are unavailable, the retrial may compound the very problem of hearsay evidence that gave rise to this case). Nothing about the retrial will be in any way contemporaneous: the passage of time only renders evidence more suspect, not less.

Writs of habeas corpus ring hollow at this belated hour and after careful state court consideration of the case. The seeming flaw we have detected after flyspecking state process does not warrant resurrection of what has long been laid to rest. I respect the majority's concern for the perils inherent in child abuse prosecutions which may involve the most baseless and even vengeful accusations. Nothing of that sort is hinted here, however. Harmless-error doctrine recognizes that trial is an ordeal to which citizens should not lightly be subjected twice. By declining to apply the doctrine, the majority renders an event six years in this family's past one it may prove unable to forget.