UNITED STATES, Appellee,

v.

**Clifford E. BATTEN, Hospital Corpsman Third Class, U.S. Navy, Appellant.**

No. 63,135.

NMCM 88 1482.

U.S. Court of Military Appeals.

Argued Feb. 15, 1990.

Decided Sept. 26, 1990.

For Appellant: *Lieutenant T.E. Miro*, JAGC, USNR (argued); *Lieutenant Commander D.M. Crisalli*, JAGC, USN (on brief).

For Appellee: *Lieutenant Stephen Ponticiello*, JAGC, USNR (argued); *Commander Thomas W. Osborne*, JAGC, USN (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

On November 2 and 3, 1987, appellant was tried by a military judge sitting alone as a general court-martial at Naval Construction Battalion Center, Gulfport, Mississippi. Contrary to his pleas, he was found guilty of committing an indecent act on a 2–year–old child, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934.* He was sentenced to a dishonorable discharge, confinement for 2 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged. The Court of Military Review affirmed the findings of guilty and the sentence in an unpublished opinion dated July 31, 1989.

This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONTATION BY ALLOWING THE COM-

---

\* The specification as found by the judge alleged that the accused

 did, on board Naval Construction Battalion Center, Gulfport, Mississippi, on or about 16 April 1987, commit an indecent act upon

and/or with the body of Bridget, a female under the age of 16, not the wife of the said [accused], by placing his fingers upon her genitalia with the intent to arouse and gratify the lust and sexual desires of said [accused].

PLAINANT TO TESTIFY BEHIND A PARTITION.

We hold that the military judge committed harmless error, if any error at all, when he permitted use of a partition to prevent the then 3–year–old child-victim witness from seeing appellant during her testimony. *See generally Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988); *United States v. Thompson*, 31 MJ 168 (CMA 1990).

The record of trial indicates the following testimony from Beverly, the child's mother. Around February 28, 1987, appellant began babysitting her daughter, 2–year–old Bridget, by himself. Around the middle of March 1987, Beverly noticed a reoccurring redness in her daughter's vagina, but she did not determine the cause of the redness. On April 16, 1987, Beverly returned home while her daughter was asleep. That night, at approximately 2300 hours, Bridget awoke and discovered her mother was home. "She appeared to be frightened and agitated" and began crying. Bridget stated to her that appellant had "stuck his finger in me." Beverly visually checked Bridget's vagina and noticed that it appeared red. Bridget refused to sleep in the "bed in her room," and while she slept on the sofa, Beverly observed her daughter "thrash around" and cry out, "No don't touch me!" Finally, Beverly testified that Bridget visibly reacted whenever she saw pickup trucks resembling appellant's tan truck.

Dr. James D. Wooten, III, also testified that he examined Bridget on April 17, 1987. and found her to be suffering from vulva-vaginitis, which is inflammation or irritation of the female genital area. Moreover, after being told not to name anyone Bridget may have mentioned, Dr. Wooten testified that Bridget stated, "Someone put his fingers in me." On cross-examination, Dr. Wooten agreed that the observed redness could have been caused by sources other than sexual molestation or by medical causes such as candidavaginitis. Moreover, he admitted that some of Bridget's medical history was supplied by her mother regarding the alleged sexual abuse. Doctor JoAnne Calhoun, a psychologist, testified that she had been hired to examine Bridget for sexual abuse and to treat her if abuse had occurred. She testified that Bridget related to her that appellant had touched her vagina and had "put his penis in my butt."

Bridget testified, but her testimony was confusing, and she became distracted by the anatomical dolls. She did, however, state that appellant "stuck his finger under my butt." Defense counsel had earlier objected and challenged Bridget's competence as a witness and ability to comprehend the oath. This objection was overruled. Further attempts to question Bridget were unsuccessful, and she was excused. Defense counsel thereafter successfully moved to dismiss the Charge and its three specifications alleging carnal knowledge and rape of Bridget, in violation of Article 120, UCMJ, 10 USC § 920; and Additional Charge I and its specification of assault and battery, in violation of Article 128, UCMJ, 10 USC § 928.

Appellant testified and denied committing the remaining indecent acts charged against him. He did admit touching Bridget's genitalia but only at the request of her mother and for the purpose of applying Desitin, a vaginal irritation ointment. Bridget's mother at first said it was a "possibility" she made such a request; but when recalled by the prosecution, she denied doing so. Thereafter, the military judge as the factfinder found appellant guilty of committing an indecent act by placing his fingers upon Bridget's genitalia, in violation of Article 134.

He also entered special findings as follows:

> I don't usually do this; *I'd like to give you the basis of my findings at this point.* I know you didn't ask for specific findings. *I'd like to emphasize those things that I thought were important and those things that I placed less or no significance on.* There may be other considerations here, *but I want you to understand that I did not consider the*

*testimony of Doctor Calhoun or the testimony of Bridget to be of significance in my decision.* Doctor Calhoun's testimony was based on events and interviews that occurred 10 to 12 days and/or some months after the incident in question. [Bridget's] testimony today in Court could also have been a result of the preparation for the testimony today in Court done with Doctor Calhoun. Therefore, in effect, she could've been repeating what had been jogged in her memory. What was of significance was the excited utterance made shortly after the alleged incident on the night of the 16th of April, the nightmare that occurred that night, and it continued for two weeks after that night, the statement the next morning to a medical doctor when she was seeking treatment for what I believe the little girl perceived as a[n] injury or a hurt to herself and the reaction to the accused and to his vehicle which was exhibited during this period of time. Does anybody have any questions about my specific findings?

[No response.]

(Emphasis added.)

The factual basis for the granted issue is set out in the motion for appropriate relief which trial counsel made before the child testified. He stated:

That when Bridget testifies, appropriate accommodations be made. Government asserts that the following proposed accommodations do not infringe on the accused's 6th Amendment right to confront the witness against him; however, if the military judge discovers otherwise, the Government will present predicate evidence to show waiver and necessity. The proposed accommodations are: that three chairs be placed directly in front of the military judge's bench; that when Bridget testifies, one chair be occupied by HM1 James [C], one chair be occupied by the questioning counsel, and one chair be occupied by Bridget; that both defense and trial tables be moved forward; that immediately behind defense table there'd be two partitions—these partitions would form a 90–degree angle;

that paper be taped to the bottom of the partitions, that the paper touches the floor; this would prohibit Bridget from seeing the feet of the people behind the partition; Government was not able to procure partitions that reached the floor; there will be one partition perpendicular to the port wall; however, the partition, because of its design, does not touch the wall; therefore, Government proposes that paper shield the area between the wall and the partition so that shadows of people moving behind the partition cannot be observed by Bridget; Government does not propose that the entire space between the wall and the partition be shielded, perhaps just the top two feet; that one defense counsel sit at defense's table during direct examination; the other defense counsel and the accused would sit behind the partition; that Bridget's face, during examination, be taped by means of a video camera.

MJ: I'm sorry, You said taped?

TC: Yes, sir. I did not mean taped. I mean captured, by means of the video tape camera.

MJ: Because you know, of course, video tape of the proceedings is not permitted.

[Trial counsel nods in an affirmative manner.]

TC: That behind the partition, sitting on a table, there will be a television monitor enabling both defense counsels and the accused to simultaneously view Bridget's testimony; that both defense counsels and the accused, sitting behind the partition, be provided a clipboard and paper; that should either one of them desire to pass notes during direct examination, to defense counsel sitting at defense table, that he be permitted to do so between the space between the partition and the wall, the space that will not be shielded; that during cross-examination of Bridget, should it become necessary for either defense counsels and/or the accused to confer together, that the

military judge grant adequate recesses; regardless, that during cross-examination of Bridget, that the military judge grant recesses at reasonable intervals so that defense counsels and the accused can confer; that before Bridget enters the courtroom, all participants take their seats; and that defense counsels and the accused be cautioned not to give any indication whatsoever of anyone's presence behind the partition.

CDC: To which we object to in its entirety based on the 6th Amendment right to confront and cross-examine witnesses. I hardly think the framers had in mind that type of lukewarm confrontation when they used that word.

MJ: I'll wait and see what the psychologist/psychiatrist, whatever you've got coming in, indicated as to *the effect of the presence of the accused in terms of the little girl while she's testifying as to whether or not that would interfere with her ability to testify, whether she would be traumatized or whatever.* If, in fact, it is established to my satisfaction that something has to be done, what you had set up certainly meets with what I had viewed as the confrontation requirement of the 6th Amendment. It's different than anything you've ever seen. What will happen here is that instead of using an out of the area two-way or one-way television, *we'd use a combination of partition and one-way television to provide the counsel with a view of her face, but more importantly in the other instances, the other cases, that I've read, the finder of fact has been separated from the witness, and I didn't want to be separated from the witness.* I want to be here with the witness so I can observe her personally to make those decisions which I have and I alone must make in this case. The key will be whether or not she's able to testify with Petty Officer Batten in the same room. If she isn't, then that system is something I think that I'm going to have to go with in this case. I don't want to prejudge until we see what the experts say as to the effect that his presence may be on the witness in this case. I assume you are familiar with the various cases in the field where they use both two-way and one-way television and partitions and in various states and so forth have upheld those as not being a violation of the right to confrontation. We don't have any established precedents in the military yet. The only case I'm aware of is a closed-circuit, two-way television set up which was done a couple of years ago in Camp LeJuene, I believe it was. This hybrid system hopefully will be more protective of the rights of the individual on trial than that system was. That's about as far as I can go with it at this point. I don't want to make any prejudgment until we hear from the expert witnesses in the area, and that, again, will be in the same line where you're trying to establish that the spectators should be excluded for her testimony. Then we'll also ask the questions concerning her ability to testify in the presence of the accused in this particular case.

TC: Yes, Your Honor.

MJ: How old is the girl by the way?

TC: She's three years old now, sir.

MJ: She's three years old.

(Emphasis added.)

On the question of placing a partition between Bridget and appellant during her testimony, the military judge inquired of Doctor Calhoun whether Bridget could testify without undue harm:

MJ: What we're really talking about here is two factors. Is it possible she will suffer some psychological trauma if she has to face the individual that she thinks that is responsible for her problems?

A: I understand that and I think she would.

MJ: Is it possible that with him sitting 15 feet away from her it will somehow affect the ability of counsel to elicit

from her. I realize she's only 3 years old, but elicit from her some coherent testimony?

A: She's a rather distractable child and sometimes you can communicate very directly with her, but other times you cannot; and if she were frightened, I think it might make it impossible to interview her.

MJ: Do you think that seeing the person she calls Clifford in this courtroom may result in that mental state on her part, that is, she would be frightened at that point?

A: I would say so, yes.

Later on, the judge affirmatively ruled on the prosecution's motion:

Let me make my ruling here. Based on what she had said, I'm going to concur with the request of the prosecution that we set up some kind of elaborate system as a bifurcated system, which I hope will answer the critics of the other two systems that have been used, that is the closed circuit television and so forth. We can decide by the way that if we really get into a thorny issue with the spectators, there's always a possibility of a remote television hookup with them, so they could watch somewhere else, if necessary as opposed to watching in here. We have all kinds of possibilities here. This is all first impression stuff because it's never been done before anywhere that I can find. I think that the system that I'd like to have with the partitions and the internal one-way TV monitor for the accused and one of the counsel—I assume that you will be interviewing the child?

DC: Yes, sir.

MJ: As the trial counsel has set up, I mean it was more like a construction list for a CB base than it was for a courtroom procedure, I realize but I think that will safeguard everybody's interest here to make sure that we do not traumatize the child and do provide the person that needs to see the victim, the alleged victim, testify, that's me, to see her, to meet her on the stand, and you'll be able to be right there with her, and anything you might have than you can relate through your counsel back over to the other counsel so we can cover all the bases to make sure that there's an adequate representation from the defense in this as well. Hopefully, that will satisfy the critics of the two-way, out-of-the-courtroom TV set-up and/or just the partition set-up since we're going to have a combination of both.

TC: Sir, are you making your ruling just based upon the necessity of it?

MJ: That's the key?

TC: Or waiver and necessity?

MJ: They're not waiving.

TC: No. No.

MJ: This is an issue they'll take up on appeal, if it goes that far.

TC: I think the question need be addressed, sir?

MJ: The address is necessity, and I've addressed that. It's necessity from the point of view—two aspects: (1) that it may traumatize the child, and (2) it may affect her testimony. Frankly, in this case I think in the interest of the defense it's more important that her testimony not be affected because she may clam up completely, one way or the other. Frankly, we've already gotten a lot of information in front of the trier of fact, as much as you normally have in a case like this, so now we're just talking about her statements. So it's probably more in their interest at this point, when they talk to her, to see if they can find something that's inconsistent in what she said, or another explanation for what happened, or something of that nature which hasn't been yet presented by the Government.

The trial resumed on the second day as follows:

MJ: The court will come to order.

[The court came to order at 0905, 3 November 1987.]

MJ: Let the record reflect that the courtroom has now been partitioned so that the accused and his counsel, Mr. Dykes, are now behind the partition so that when Bridget comes in to testify she will not be able to see either of them. I also note for the record that we have taken photographs from three different angles showing the area behind the partition, showing the partition from behind the bench, and showing the seating arrangement in front of the bench viewed from in front of the bench. We also have the Government's description of what has been done here which has been marked as Appellate Exhibit III. The photographs, the three different views, will be marked as Appellate Exhibits IV, V, and VI. Those were taken this morning by a representative of the photo lab here from the Seabee base. Now, just so there is no question as to how this came about, I think it's best to indicate that government counsel indicated to me in a telephone call that he was going to make a motion either for two-way television or for a partition. After researching the matter I got back to him with what is now the format that we're going to use in this case as the best way of protecting the rights of the accused and of providing an atmosphere to facilitate the testimony of victim in this case. That is, in fact, what has been accomplished. I also understand that the prosecutor did, in fact, talk with the defense counsel concerning this, and, of course, yesterday the defense objected to this. I overruled their objection and we're going to proceed with this set-up. I realize that this is a first-impression set-up. Hopefully, it will deal with the critics of just using a partition or just using the television monitor. This way, hopefully, the rights of both sides can be adequately protected. At this point, then, are you ready to proceed with Bridget?

-------

In *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the Supreme Court addressed the question of whether a screen could be placed between an accused and the child-victim witnesses who were testifying against him. The screen in that case allowed the accused "dimly to perceive the witnesses, but the witnesses to see him not at all." *Id.* at 1015, 108 S.Ct. at 2799. In the absence of a particularized finding that these child-witnesses needed special protection, the Supreme Court held that use of such a screen violated that accused's Sixth Amendment confrontation right. *Id.* at 1020–21, 108 S.Ct. at 2803.

In *Maryland v. Craig,* —— U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), a majority of the Supreme Court approved one-way closed-circuit television testimony by a child-witness who was outside the courtroom and the presence of the accused. The Court generally ruled that "face-to-face confrontation" was not mandated by the Sixth Amendment in all cases. It held that such confrontation could be dispensed with "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 110 S.Ct. at 3166. Later on, Justice O'Connor more particularly said:

> The requisite finding of necessity must of course be a case-specific one: the trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant.... Finally, the trial court must find that the emotional distress suffered by the child in the presence of the defendant is more than *de minimis, i.e.,* more than "mere nervousness or excitement or some reluctance to testify."

110 S.Ct. at 3169 (citations omitted).

■ Appellant was in the courtroom behind a partition with a closed-circuit TV

monitor showing the child-witness testifying in the same courtroom. Such a procedure is a substantial improvement over the procedure approved in *Maryland v. Craig, supra,* in light of its provision for the witness' physical presence in the courtroom. Moreover, we see no error in the particular determination of necessity made by the military judge in this case. *See United States v. Thompson,* 31 MJ 168 (CMA 1990). His assiduous approach to this whole matter should be commended.·

 In any event, as properly noted by the court below, appellant's conviction may be properly affirmed on narrower grounds. In *Coy v. Iowa, supra,* the Supreme Court noted:

We have recognized that other types of violations of the Confrontation Clause are subject to that harmless error analysis, and see no reason why denial of face-to-face confrontation should not be treated the same. An assessment of harmlessness cannot include consideration of whether the witness's testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.

487 U.S. at 1021–22, 108 S.Ct. at 2803 (citation omitted).

*Maryland v. Craig, supra,* has not changed or altered *Coy v. Iowa, supra,* in this regard. Accordingly, we can apply a harmless-error analysis to the case at bar.

Pursuant to *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the relevant inquiry "is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23, 87 S.Ct. at 827, quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). To answer this question, we must consider

a host of factors, ... includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testi-

mony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations omitted.]

*United States v. Vanderwier,* 25 MJ 263, 267 (CMA 1987), quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

Our review of the record of trial leads us to conclude that the challenged trial testimony of Bridget played no role in appellant's conviction. The military judge sat as the trier of fact in this case, and his specific findings contained an express rejection of any reliance upon the trial testimony of the challenged witness. *See United States v. Aurich,* Dkt. No. 63,386, 31 MJ 95 (CMA 1990); *United States v. McConnico,* 7 MJ 302, 304 n.4, 310 (CMA 1979). In addition, the single accusatory statement in Bridget's testimony at trial was cumulative of the unobjected-to testimony of her mother concerning a similar accusation made by the child shortly after the alleged offense. *See* Mil.R.Evid. 803(2), Manual for Courts–Martial, United States, 1984. *Cf. Idaho v. Wright,* —— U.S. ——, 110 S.Ct 3139, 111 L.Ed.2d 638 (1990). Therefore, no gap in required proof existed in this case. *Cf. Gregory v. State,* 900 F.2d 705, 710 (4th Cir.1990). Also, the mother and treating physician both testified that they observed physical indications on Bridget's genitalia that were consistent with her out-of-court statements. Finally, appellant himself testified that he had touched the child's genitalia, as requested for the purpose of applying medical ointment. Bridget's trial testimony, as meager as it was, did not even address the crucial "Desitin" question or whether such a request was in fact made by her mother. Accordingly, we are satisfied beyond a reasonable doubt that any error in use of the partition in the instant case was harmless beyond a reasonable doubt.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COX concur.